LeBLANC v STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY

Docket No. 62439. Argued January 9, 1980 (Calendar No. 10).—Decided February 3, 1981. Rehearing denied 411 Mich 1119.

Joseph LeBlanc, who was over 65 years old and qualified for Medicare benefits, brought an action against State Farm Mutual Automobile Insurance Company for payment of personal protection insurance benefits under a no-fault insurance policy. The defendant had reduced insurance payments to the plaintiff by the amount of Medicare benefits paid under the Social Security Act for hospital and medical services for the injuries the plaintiff suffered when he was struck by an automobile. The plaintiff had not elected to coordinate his no-fault insurance coverage with his Medicare coverage. The Houghton Circuit Court, Stephen J. Condon, J., granted summary judgment for the plaintiff, holding that the defendant was not entitled to a mandatory set-off of Medicare benefits under the no-fault insurance act. The Court of Appeals, J. H. Gillis, P.J., and R. M. Maher, J. (D. E. Holbrook, J., dissenting), reversed in a per

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 5, 11, 12, 23-25] 7 Am Jur 2d (Rev), Automobile Insurance §§ 291, 292, 368.

[3, 8, 10-12] 7 Am Jur 2d (Rev), Automobile Insurance §§ 34, 292, 368.
Validity and construction of "no-fault" automobile insurance plans. 42 ALR3d 229.

[4, 7, 8, 11] 7 Am Jur 2d (Rev), Automobile Insurance §§ 2-4, 34.

[6] 7 Am Jur 2d (Rev), Automobile Insurance §§ 3, 126.

[9, 16] 7 Am Jur 2d (Rev), Automobile Insurance § 292.

[13] 73 Am Jur 2d, Statutes § 278 et seq.

[14, 20] 7 Am Jur 2d (Rev), Automobile Insurance § 368.

[15] 7 Am Jur 2d (Rev), Automobile Insurance §§ 22, 23.

[17] 7 Am Jur 2d (Rev), Automobile Insurance § 367.

[18] 7 Am Jur 2d (Rev), Automobile Insurance §§ 23, 34, 368.

[19] 7 Am Jur 2d (Rev), Automobile Insurance §§ 24 et seq., 368.

[21] 7 Am Jur 2d (Rev), Automobile Insurance § 34.
73 Am Jur 2d, Statutes §§ 145, 150.
Validity and construction of "no-fault" automobile insurance plans. 42 ALR3d 229.

[22] 7 Am Jur 2d (Rev), Automobile Insurance §§ 291, 340 et seq.

curiam opinion holding that the Medicare payments were benefits provided under Federal law and that the defendant was, therefore, entitled to the mandatory set-off (Docket No. 78-261). Plaintiff appeals. In an opinion by Chief Justice Coleman, joined by Justices Williams, Fitzgerald, and Moody, the Supreme Court *held:*

The statutory phrase "other health and accident coverage", used in the section added to the no-fault statute to allow coordination of benefits, *i.e.,* the election of deductibles and exclusions reasonably related to other health and accident coverage at a reduced premium rate, includes benefits paid under the Medicare program. Thus, Medicare benefits are not subject to mandatory set-off as benefits provided under Federal law.

1. The no-fault insurance act requires a subtraction of benefits provided or required to be provided under state or Federal laws (which have been held to include social security survivors' benefits and workers' compensation benefits) from no-fault personal injury benefits otherwise payable. The act also permits coordination of benefits, *i.e.,* a set-off of "other health and accident coverage", at the option of the insured. The optional set-off provision, like the mandatory set-off of the benefits provided by law, serves to eliminate duplicative recovery and to contain or reduce insurance costs. In addition, it allows insured persons to tailor their insurance coverage to their own special needs, reduces insurance costs to the individual rather than spreading the saving among all no-fault insurance consumers.

2. The phrase "other health and accident coverage" used in the coordination-of-benefits section clearly means coverage other than no-fault personal protection benefits, not, as the defendant argues, coverage other than benefits required to be provided by law including Medicare benefits. To limit coordination of benefits to private benefits is incompatible with and unwarranted by a common-sense reading of the text of the statute. The legislative history of the provision suggests that the Legislature, by its failure to modify the phrase "other health and accident coverage" with the word "private", intended to permit the optional coordination of such benefits from whatever source. The analysis of the House Insurance Committee indicated that both private and non-private plans were within the scope of the provision. Further, the Insurance Commissioner advised the Governor when the coordination-of-benefits provision was being enacted that Medicare recipients must be offered no-fault personal injury protection at reduced rates under the proposed amendment. It is presumed that the

Legislature considered the Insurance Commissioner's advice in enacting the provision, and the Court gives some weight to the interpretation given to a statute by the official charged with its enforcement.

3. The Legislature deliberately used different words in describing items subject to set-off in the mandatory set-off and permissive coordination-of-benefits provisions. The mandatory provision is addressed to *benefits,* the permissive provision to *coverage.* The word "coverage" has a precise meaning in insurance: it refers to protection afforded by an insurance policy, or the sum of the risks assumed. The use of the word was not inadvertent, and evinces an intent to provide unique treatment to health and accident insurance, as opposed to other perhaps equally duplicative benefits. Medicare is "other health and accident coverage" qualifying for permissive set-off. There is no just reason to differentiate Medicare coverage from "other health and accident coverage" within the scope of the optional set-off provision, because Medicare also compensates providers of medical and hospital services on behalf of participants who require health care. It is inconsequential that in other contexts Medicare has been deemed not to be insurance in the usual sense of the term: the same has been said of Blue Cross and Blue Shield plans. Construing the optional set-off provision to include Medicare benefits comports with and fosters the purposes of the provision, *i.e.,* to eliminate duplicative recovery and to contain or reduce insurance costs. If Medicare participants choose to coordinate their Medicare benefits with their no-fault insurance, they obtain a direct reduction of no-fault premiums and forego the double recovery.

4. The optional set-off provision recognizes that certain persons require additional health and accident coverage. Medicare applies exclusively to elderly persons, who often have an expanded need for health care, a convincing reason for including it within the optional set-off provision. Since the plaintiff in this case did not elect to coordinate his Medicare benefits with his no-fault benefits, payments made on his behalf by the Medicare program may not be set off by the defendant.

5. The Court did not reach the question whether the permissive set-off provision is constitutional, nor did it express an opinion on the inclusion of other forms of health and accident insurance within the optional provision.

Reversed.

Justice Levin, joined by Justice Kavanagh, dissenting in part, wrote that the decision that payment of no-fault benefits that duplicate Medicare benefits must be made answers the question

in a manner that fails to implement the Legislature's efforts to reduce the cost of no-fault insurance to consumers by eliminating duplication.

1. The no-fault insurance act provides that no-fault benefits otherwise payable are to be reduced by benefits provided under state or Federal law. Medicare payments are provided under the Federal Social Security Act, and thus are to be subtracted from no-fault benefits otherwise payable. The basic goal of the mandatory set-off provision is to reduce the cost of no-fault insurance by eliminating the requirement to pay benefits which duplicate benefits already received from the government; the Legislature anticipated that by reducing the benefits that had to be paid by no-fault insurers, it would reduce the premiums no-fault insurers had to collect.

2. An amendment enacted two years after the no-fault act carries the effort to reduce the cost of no-fault insurance a step further. It requires no-fault insurers to offer policies whose coverage is coordinated with the insured's other insurance coverage, and to reduce premiums commensurate with the reduced coverage. In other words, no-fault coverage can thereby be reduced to the extent the insured is already covered under another policy, so the insured is not required to double-insure. Thus, both provisions attempt to coordinate benefits, the first mandatorily and the second at the option of the insured. Both sections have the same purpose, to reduce the cost of no-fault insurance by removing the obligation to pay benefits which merely duplicate benefits received for the same loss from another source.

3. Despite the similarity of approach and purpose of the two sections, the Court concludes that the provision for coordination of benefits has by implication partially repealed the provision for a mandatory set-off of government benefits. The Court reasons that because Medicare is insurance coverage whose coordination with no-fault coverage is at the option of the insured, its benefits cannot be subject to the mandatory coordination required by the set-off provision. It is not known why the Legislature made coordination of other insurance optional. However, the conclusion that part of the purpose for doing so was to repeal by implication the mandatory coordination of duplicative governmental benefits required by the set-off provision is a construction that stands the basic purpose of the coordination provision on its head. Instead of helping to further *eliminate* duplication, the coordination provision thereby works to *allow* duplication heretofore eliminated under the set-off provision.

4. It is not necessary to construe the two provisions as

mutually exclusive; both can be given full operative effect. Medicare payments, as a governmental benefit under the mandatory set-off provision, are to be subtracted from no-fault benefits otherwise payable. And no-fault insurers, under the optional coordination provision, must offer, at appropriately reduced premiums, deductibles and exclusions reasonably related to the insured's Medicare coverage. Since the two provisions are not necessarily inconsistent, and since giving full effect to each furthers their basic purpose of eliminating duplication, the sections should be so construed. This construction coincides with that of the Commissioner of Insurance, whose agency has the responsibility of administering the act, as revealed by the bulletin issued upon passage of the coordination provisions in which the commissioner explained procedures for complying with the amendment.

5. It may be considered inequitable to allow a no-fault insurer the windfall of collecting premiums to cover losses that will actually be reimbursed by Medicare. Courts, however, must resist construing statutes of such broad remedial intent as the no-fault act solely to reach an equitable result in the case at hand. Individual equity may be at the expense of the society-wide equity of the act as a whole, as conceived by the Legislature. Such may be the result here. Although the Court's construction disallows a windfall to no-fault insurers, the overall cost of no-fault insurance will rise because no-fault benefits payable will be reduced under the mandatory set-off provision only by those governmental benefits which cannot be characterized as resulting from "coverage" under the optional coordination provision.

6. The failure of insureds to accept the required offerings of reduced coverage, at a reduced premium, to reflect losses that will be reimbursed by Medicare, is more likely the result of the failure of the insurance agent to offer and explain such coordination than the result of an informed choice to double-insure. Few people are willing to pay for redundant coverage of medical expenses. If more is needed to enforce the requirement to offer coordinated coverage, the Legislature or the Commissioner of Insurance may provide it. Moreover, while the construction by the Court removes the no-fault insurer's windfall, it provides no actual encouragement for a no-fault insurer to offer coordinated coverage. As long as the premiums being collected yield a profit beyond what must be paid out in benefits, no-fault insurers can be expected to continue to sell the full coverage regardless of the fact that the benefits paid out duplicate those of Medicare.

7. While drawing a distinction between Part A and Part B

Medicare benefits because participation in Part A is mandatory and participation in Part B is voluntary might make the set-off provision a better statute, it would also make it a different statute. Part B benefits come within the literal terms of the set-off provision as benefits provided under Federal law. Absent a showing of a legislative purpose justifying judicial departure from the literal meaning, the literal language and primary purpose of the set-off provision, cost reduction for no-fault insurance, should be enforced.

Justice Ryan, also dissenting, agreed with Justice Levin's analysis of the provisions of the no-fault insurance act but disagreed with his analysis of the Medicare program because it fails to discriminate between the two programs comprised by Medicare and thus precludes what Justice Ryan believed to be the correct result in this case.

1. Medicare is a program within the Federal Social Security system which is designed to finance certain medical expenses of persons who are 65 years old and older; it consists of two parts. Hospitalization benefits (Part A) are paid as a result of mandatory payroll or self-employment taxes to persons aged 65 and over who meet the conditions for Social Security benefits, and are disbursements made to further the social welfare objectives of the Federal government. Supplementary medical benefits (Part B) are paid as a result of a voluntary plan which is open to any person 65 years old or more (except nonresident aliens), and in important respects has attributes associated with private medical insurance. Participation in Part B is entirely voluntary and benefits are generated, in part, by premiums paid by the participants. Therefore, Part B has a contractual aspect not present in Part A. The salient attributes of social welfare insurance, mandatory participation in and funding of a program which is administered by the government and designed to mitigate the economic disparities of society, are present in Part A, whereas attributes of private insurance contracts are present in Part B, imparting to it a preponderately private character.

2. The result that ensues from a literal reading of the no-fault insurance act, admittedly, would require a set-off of all Medicare benefits, Part A and Part B. It is well settled, however, that the Court is not confined to the literal meaning of statutory language in the face of a countervailing legislative intent. The history of the mandatory set-off provision indicates that the Legislature's intent was to *require* a set-off of those government benefits that duplicate the no-fault benefits payable because of the accident and thereby reduce or contain the cost

of basic insurance. The specific mechanism for the reduction of the cost of basic insurance is the provision of the no-fault act which requires the no-fault insurer to charge appropriately reduced premium rates and serves to coordinate no-fault insurance with other health and accident coverage, whether that coverage is governmental or non-governmental, to encourage elimination of overlapping coverage. However, the coordination provision does not proscribe overlap between no-fault and private medical insurance, and permits persons with needs exceeding the benefits provided by no-fault insurance to obtain the extra coverage they require.

3. The no-fault act does proscribe overlap between no-fault and "government benefits". It is apparent that the Legislature intended to eliminate overlapping benefits to the extent that the insured must involuntarily participate in the programs creating the overlap. In the case of no-fault insurance and Social Security, both mandatory government programs, the insured has no choice but to be the object of overlapping coverage. And since the insured must pay, in one form or another, for the duplicative coverage, the insured, by the confluence of unrelated government programs, is forced to pay for more insurance than circumstances require. That is the bane the set-off provision is intended to redress. One should be allowed, but not required, to obtain duplicative coverage.

4. Part B Medicare benefits, to the extent that they are the product of voluntary contributions, do not entail the harm that the mandatory set-off provision was enacted to avoid, and, therefore, should not be subject to the mandatory set-off. It is important to note, however, that Part B benefits derive from both voluntary and involuntary contributions. It follows that only the part of the benefits attributable to the voluntary monthly premiums of the subscribers can justifiably escape the mandatory set-off. Any less set-off would result in a windfall for the subscribers to the Part B Medicare program. Because it is unclear in this case under which part and to what extent the Medicare benefits were paid, the case should be remanded to the trial court to decide that question.

87 Mich App 555; 274 NW2d 69 (1978) reversed.

OPINION OF THE COURT

1. INSURANCE — NO-FAULT INSURANCE — COORDINATION OF BENEFITS — MEDICARE.

The phrase "other health and accident coverage" in the provision for optional reduction of personal protection insurance coverage under the no-fault insurance act includes benefits paid under

the Medicare program of the Social Security Act; thus, Medicare benefits may be coordinated with no-fault personal protection benefits at the option of the insured (42 USC 1395 *et seq.;* MCL 500.3109a; MSA 24.13109[1]).

2. INSURANCE — NO-FAULT INSURANCE — COORDINATION OF BENEFITS.

The no-fault insurance act requires a subtraction of government benefits provided or required to be provided under state or Federal laws, such as social security survivors' benefits and workers' compensation benefits, from personal protection insurance benefits otherwise payable; the act also permits a set-off of "other health and accident coverage" at the option of the insured (MCL 500.3109, 500.3109a; MSA 24.13109, 24.13109[1]).

3. INSURANCE — NO-FAULT INSURANCE — COORDINATION OF BENEFITS.

Construing the set-off provisions of the no-fault insurance act to permit optional coordination of benefits only where the "other health and accident coverage" is not a benefit provided under state or Federal laws is incompatible with and unwarranted by a common-sense reading of the coordination-of-benefits provision; the legislative history suggests that the legislative failure to modify the phrase "other health and accident coverage" by the word "private" was intended to permit the optional set-off of health and accident insurance from whatever source (MCL 500.3109a; MSA 24.13109[1]).

4. INSURANCE — NO-FAULT INSURANCE — STATUTES — ADMINISTRATIVE CONSTRUCTION.

It is presumed that the Legislature, in enacting an amendment to the no-fault insurance act, considered the advice of the Insurance Commissioner about the effect of the proposed amendment, and courts give some weight to the interpretation given to the no-fault insurance act by the Insurance Commissioner because he is the one charged with its enforcement (MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.).*

5. INSURANCE — NO-FAULT INSURANCE — COORDINATION OF BENEFITS — WORDS AND PHRASES.

The mandatory set-off provision of the no-fault insurance act is clearly addressed to government benefits; in a general sense, benefits are those things which promote a person's welfare, advantage or profit, and the term is distinct from the more specific term "other health and accident coverage" which is used in the provision permitting optional coordination of such insurance coverage (MCL 500.3109, 500.3109a; MSA 24.13109, 24.13109[1]).

6. Insurance — "Coverage" — Words and Phrases.

"Coverage", a word of precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed.

7. Insurance — No-Fault Insurance — Coordination of Benefits — "Coverage".

The deliberate use of the word "coverage" in the permissive set-off (coordination of benefits) amendment to the no-fault insurance act, when the rest of the no-fault act refers to benefits, clearly indicates that the Legislature intended the deductions and exclusions permitted in the amendment to be limited to other health and accident *insurance* upon the insured, as opposed to other duplicative "benefits"; the limitation of the amendment to "coverage" evinces an intent to provide unique treatment to health and accident insurance (MCL 500.3109a; MSA 24.13109[1]).

8. Insurance — No-Fault Insurance — Coordination of Benefits — Medicare — Other Insurance Coverage.

There is no just reason to differentiate Medicare from "other health and accident coverage" within the meaning of the provision of the no-fault insurance act which permits coordination of such insurance coverage because Medicare also compensates providers of medical and hospital services on behalf of participants who require health care; construing the optional set-off provision to include Medicare benefits comports with and fosters the purposes of the provision, to eliminate duplicative recovery and to contain or reduce insurance costs (42 USC 1395 *et seq.;* MCL 500.3109a; MSA 24.13109[1]).

9. Insurance — No-Fault Insurance — Coordination of Benefits — Other Insurance Coverage — Medicare.

The provision of the no-fault insurance act which permits coordination of personal protection benefits with other health and accident coverage is optional because some persons require additional coverage, *e.g.,* Medicare, which applies exclusively to elderly persons who often have an expanded need for health care; where an insured person over the age of 65 did not elect to coordinate his Medicare benefits with his no-fault automobile insurance, payments made on his behalf by the Medicare program may not be subtracted from his otherwise applicable no-fault personal protection benefits (42 USC 1395 *et seq.;* MCL 500.3109a; MSA 24.13109[1]).

DISSENTING OPINION BY LEVIN, J.

10. INSURANCE — NO-FAULT INSURANCE — COORDINATION OF BENEFITS
     — GOVERNMENT BENEFITS — HEALTH AND ACCIDENT COVERAGE.

*The two set-off provisions of the no-fault insurance act both attempt to coordinate benefits, one mandatorily for benefits received from the government and the other at the option of the insured for the insured's other health and accident coverage; both provisions have the purpose of reducing the cost of no-fault insurance by removing the obligation to pay no-fault benefits which merely duplicate benefits received for the same loss from another source (MCL 500.3109, 500.3109a; MSA 24.13109, 24.13109[1]).*

11. INSURANCE — NO-FAULT INSURANCE — COORDINATION OF BENEFITS
     — GOVERNMENT BENEFITS — HEALTH AND ACCIDENT COVERAGE.

*The Legislature, in enacting an amendment to the no-fault insurance act to allow coordination of benefits with the insured's other health and accident coverage at the option of the insured, could not have intended to repeal by implication the mandatory coordination of duplicative government benefits required by another set-off provision, because such a construction of the amendment would work to allow duplication of benefits heretofore eliminated under the mandatory provision (MCL 500.3109, 500.3109a; MSA 24.13109, 24.13109[1]).*

12. INSURANCE — NO-FAULT INSURANCE — COORDINATION OF BENE-
     FITS.

*The two set-off provisions of the no-fault insurance act are not so mutually exclusive that a particular form of government benefits may be within only one section; rather, government benefits required to be set off may still be benefits paid pursuant to health and accident coverage for which the insurer must offer premium rates reflecting deductibles and exclusions (MCL 500.3109, 500.3109a; MSA 24.13109, 24.13109[1]).*

13. STATUTES — CONSTRUCTION — INSURANCE — NO-FAULT INSUR-
     ANCE.

*Courts must resist construing a statute of such a broad remedial intent as the no-fault insurance act solely to reach an equitable result in the case at hand because individual equity may be had at the expense of the society-wide equity of the act as a whole, as conceived by the Legislature (MCL 500.3101 et seq.; MSA 24.13101 et seq.).*

14. Insurance — No-Fault Insurance — Coordination of Benefits — Medicare — Words and Phrases.

Medicare benefits are "benefits provided * * * under the laws of * * * the federal government" within the meaning of the mandatory set-off provision of the no-fault act; Medicare is also "other health and accident coverage" within the meaning of the provision that requires no-fault insurers to offer, at appropriately reduced premium rates, deductibles and exclusions to reflect an insured's Medicare coverage (42 USC 1395 et seq.; MCL 500.3109, 500.3109a; MSA 24.13109, 24.13109[1]).

15. Insurance — No-Fault Insurance — Coordination of Benefits — Health and Accident Coverage.

That the Legislature provided insureds with the option of obtaining additional health and accident coverage does not support the conclusion that part of the Legislature's purpose was to confer the option of duplicative coverage, as distinguished from coverage that supplements no-fault insurance; rather than choose which insurer would be primary, the Legislature may have made coordination optional as a compromise, in effect leaving it to each insured to decide which insurer would be primary (MCL 500.3109, 500.3109a; MSA 24.13109, 24.13109[1]).

16. Insurance — No-Fault Insurance — Coordination of Benefits — Medicare.

Medicare coverage for hospitalization and medical expenses resulting from an automobile accident does not supplement but, rather, necessarily duplicates no-fault insurance coverage; however, the Legislature, in using language which permits duplicative recovery, did not mean to encourage duplicative coverages for health care or to amend the no-fault insurance act by implication to eliminate the mandatory set-off of Medicare benefits (42 USC 1395 et seq.; MCL 500.3109, 500.3109a; MSA 24.13109, 24.13109[1]).

17. Insurance — No-Fault Insurance — Coordination of Benefits — Government Benefits — Health and Accident Coverage — Medicare.

The obligation of an insurer under the no-fault insurance act to offer deductibles and exclusions for other health and accident coverage of the insured is not limited to non-governmental accident and health coverage; Medicare is health and accident coverage and thus deductibles and rate reductions must be offered by the insurer (42 USC 1395 et seq.; MCL 500.3109a; MSA 24.13109[1]).

18. INSURANCE — NO-FAULT INSURANCE — COORDINATION OF BENEFITS — GOVERNMENT BENEFITS — MEDICARE.

*The legislative history of the no-fault insurance act does not show a legislative purpose to distinguish the government benefits available for set-off according to whether participation is voluntary or involuntary; supplementary medical benefits under the Medicare program (Part B) come within the literal terms of the set-off provision of the no-fault insurance act as benefits provided under Federal law, and absent a showing of a legislative purpose justifying judicial departure from the literal meaning, the literal language and primary purpose of the set-off provision, cost reduction for no-fault insurance, should be enforced (42 USC 1395 et seq.; MCL 500.3109; MSA 24.13109).*

19. INSURANCE — NO-FAULT INSURANCE — COORDINATION OF BENEFITS — HEALTH AND ACCIDENT COVERAGE — MEDICARE — EQUAL PROTECTION.

*There is no differential treatment amounting to a denial of equal protection of the laws by the application of the mandatory set-off provision of the no-fault insurance act to Medicare benefits because Medicare insureds as well as other health and accident insureds must be offered premium rates reflecting deductibles and exclusions related to Medicare coverage and therefore derive the same benefit from coordination of insurance as do all other health and accident insureds (US Const, Am XIV; Const 1963, art 1, § 2; 42 USC 1395 et seq.; MCL 500.3109, 500.3109a; MSA 24.13109, 24.13109[1]).*

DISSENTING OPINION BY RYAN, J.

See headnotes 11-12, 15.

20. SOCIAL SECURITY — MEDICARE — INSURANCE — HEALTH AND ACCIDENT COVERAGE.

*The salient attributes of social welfare insurance, mandatory participation in and funding of a program which is administered by the government and designed to mitigate the economic disparities of a society, are present in the hospitalization benefits program of Medicare (Part A), whereas attributes of private insurance are present in the supplementary medical benefits program (Part B), imparting to it a preponderately private character (42 USC 1395 et seq.).*

21. INSURANCE — NO-FAULT INSURANCE — COORDINATION OF BENEFITS — MEDICARE — WORDS AND PHRASES.

*A literal reading of the no-fault insurance act would require a set-off of all Medicare benefits against personal injury protec-*

tion benefits; however, the Supreme Court is not confined to the literal meaning of statutory language in the face of a countervailing legislative intent, and the history of the mandatory set-off provision indicates that the Legislature's intent was to require a set-off of those government benefits that duplicate the no-fault benefits payable because of the accident and thereby reduce or contain the cost of basic insurance (42 USC 1395 et seq.; MCL 500.3109; MSA 24.13109).

22. Insurance — No-Fault Insurance — Coordination of Benefits — Health and Accident Coverage.

The specific mechanism the Legislature provided for the reduction of the cost of basic motor vehicle insurance is that provision of the no-fault insurance act which requires the no-fault insurer to charge appropriately reduced premium rates and serves to coordinate no-fault insurance with other health and accident coverage, whether that coverage is governmental or non-governmental, to encourage the elimination of overlapping coverage; however, the coordination provision does not proscribe overlap between no-fault and private medical insurance, and permits persons with needs exceeding the benefits provided by no-fault insurance to obtain the extra coverage they require (MCL 500.3109a; MSA 24.13109[1]).

23. Insurance — No-Fault Insurance — Coordination of Benefits — Government Benefits.

The no-fault insurance act proscribes overlap between no-fault and government benefits; it is apparent that the Legislature intended to eliminate overlapping benefits to the extent that the insured must involuntarily participate in the programs creating the overlap (MCL 500.3109; MSA 24.13109).

24. Insurance — No-Fault Insurance — Coordination of Benefits — Government Benefits — Medicare.

Benefits under the supplementary medical program of Medicare (Part B), to the extent that they are the product of voluntary contributions, do not entail the harm that the mandatory set-off provision of the no-fault insurance act for government benefits was enacted to avoid, and, therefore, should not be subject to the set-off of that provision (42 USC 1395j-1395w; MCL 500.3109; MSA 24.13109).

25. Insurance — No-Fault Insurance — Coordination of Benefits — Government Benefits — Medicare.

Only the part of the Medicare benefits attributable to the voluntary monthly premiums of the subscribers can justifiably escape

*the mandatory set-off of the no-fault insurance act for govern-
ment benefits; any less set-off would result in a windfall for
those subscribers (42 USC 1395j-1395w; MCL 500.3109; MSA
24.13109).*

*McLean & McCarthy* for plaintiff.

*Weis & Cossi, P.C.* (by *Timothy M. Dean*), for
defendant.

COLEMAN, C.J. Section 3109(1)[1] of the Michigan
no-fault insurance act[2] requires a subtraction of
benefits provided under the laws of state or federal
government from the amount of personal protec-
tion insurance benefits payable under any no-fault
insurance policy. A second provision of the no-
fault act, § 3109a,[3] permits a coordination of no-
fault personal protection benefits with "other
health and accident coverage on the insured". The
principal question presented in this case is
whether Medicare payments, made on behalf of a
qualifying participant to cover expenses incurred
as a consequence of an accident for which no-fault
benefits are also payable, *must* be set off in accor-
dance with § 3109(1) as benefits provided under the
laws of the federal government, or whether such
payments *may* be set off under § 3109a as "other
health and accident coverage on the insured". The
Court of Appeals ruled in a 2-to-1 decision that
§ 3109(1) requires a set-off of Medicare payments
against no-fault benefits otherwise due.[4] We re-
verse the decision of the Court of Appeals. The
phrase "other health and accident coverage" con-
tained in § 3109a contemplates benefits provided to
qualified participants under the Medicare pro-

[1] MCL 500.3109 subd (1); MSA 24.13109 subd (1).
[2] 1972 PA 294, MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.*
[3] MCL 500.3109a; MSA 24.13109(1).
[4] 87 Mich App 555; 274 NW2d 69 (1978).

gram; thus, Medicare benefits may be coordinated
with no-fault personal protection insurance bene-
fits at the option of the insured. In view of our
holding on the principal question, we do not reach
the constitutional issue framed in our order grant-
ing leave to appeal.

I

Plaintiff sustained multiple injuries in a pedes-
trian/automobile accident which occurred on June
2, 1976, and as a result, required extensive hospi-
talization and outpatient treatment. At the time of
the accident, plaintiff was over the age of 65 and
was eligible to receive Medicare benefits pursuant
to certain sections of the Social Security Act[5]
which provide payment for eligible medical expen-
ses on behalf of qualified individuals.[6] Plaintiff
additionally qualified for personal protection insur-
ance benefits under the no-fault insurance policy
issued him by defendant. The policy in question
contained a provision mandating a subtraction of
benefits payable by a state or federal government
from no-fault benefits otherwise due. Defendant
does not submit that plaintiff paid a reduced no-
fault premium in recognition of his eligibility for
Medicare benefits.[7]

Medicare disbursed a total of $13,539.57 to vari-
ous providers in payment of hospital and medical

[5] 42 USC 401 *et seq.*

[6] 42 USC 1395-1395rr.

[7] The policy issued plaintiff by defendant was not made a part of
the record on appeal. At the request of the clerk's office, plaintiff's
counsel submitted a certified true copy of the policy to the Court,
along with a copy of plaintiff's premium notice for a subsequent
period (the latter item is said to indicate applicable coverages also in
effect for the period in which the accident occurred). These documents
designate plaintiff's coverage as "P", meaning that allowable expenses
were payable on a primary, rather than on a coordinated, basis with
respect to benefits provided under another policy or plan.

expenses incurred by plaintiff as a result of his accident.[8] Defendant paid no-fault benefits with respect to qualified items of hospital and medical care not covered by Medicare, but refused to compensate plaintiff for those expenses which were picked up by Medicare, claiming that Medicare benefits were required to be subtracted from no-fault benefits under § 3109(1) of the no-fault act.

On April 15, 1977, plaintiff brought an action in circuit court to recover from defendant no-fault benefits for Medicare-reimbursed hospital and medical expenses, and attorney's fees.[9] The circuit court denied the claim for attorney's fees, but awarded summary judgment in plaintiff's favor on the set-off issue, relying on *O'Donnell v State Farm Mutual Automobile Ins Co,* 70 Mich App 487; 245 NW2d 801 (1976).[10] Defendant appealed[11] to the Court of Appeals, which reversed on the set-off issue in a 2-to-1 decision.[12] Plaintiff appealed and we granted leave to appeal on the following issues: "(1) whether MCL 500.3109 and 500.3109a; MSA 24.13109 and 24.13109(1) can be construed to allow a no-fault insurer to set off for Medicare benefits; and (2) whether MCL 500.3109; MSA 24.13109 is constitutional if it is construed to allow

[8] The record does not disclose what portion of these expenses was paid pursuant to Part A of the Medicare program, or what portion was paid pursuant to Part B of Medicare. At oral argument on January 9, 1980, counsel for plaintiff implied that plaintiff was a Part B Medicare participant.

[9] MCL 500.3148(1); MSA 24.13148(1) provides for reasonable attorney's fees in a no-fault action "for advising and representing a claimant in an action for personal or property protection insurance benefits which are overdue".

[10] At the time judgment was entered in the circuit court, *O'Donnell* was pending decision by this Court. See 404 Mich 524; 273 NW2d 829 (1979).

[11] Plaintiff cross-appealed the circuit court's denial of attorney's fees to the Court of Appeals, which affirmed on that point. 87 Mich App 555, 558; 274 NW2d 69 (1978). Attorney's fees are no longer in dispute.

[12] 87 Mich App 555; 274 NW2d 69 (1978).

a no-fault insurer to set off for Medicare bene-
fits".[13]

## II

Before addressing the specific arguments ad-
vanced by the parties on appeal, we consider the
pertinent statutory provisions, the intent of the
Legislature underlying their enactment, and inter-
pretations given them by the courts of this state.

Section 3109(1) states:

"Benefits provided or required to be provided under
the laws of any state or the federal government shall be
subtracted from the personal protection insurance bene-
fits otherwise payable for the injury."[14]

This section has been the subject of extensive
litigation;[15] almost invariably,[16] the governmental

[13] 406 Mich 1009 (1979).

[14] MCL 500.3109(1); MSA 24.13109(1).

[15] See, e.g., Wysocki v Detroit Automobile Inter-Insurance Ex-
change, 77 Mich App 565; 258 NW2d 561 (1977), rev'd 406 Mich 860;
275 NW2d 551 (1979); Pollock v Frankenmuth Mutual Ins Co, 79
Mich App 218; 261 NW2d 554 (1977); Smart v Citizens Mutual Ins Co,
83 Mich App 30; 268 NW2d 273 (1978); Hawkins v Auto-Owners Ins
Co, 83 Mich App 225; 268 NW2d 534 (1978), aff'd 408 Mich 164; 289
NW2d 708 (1980); Greene v State Farm Mutual Automobile Ins Co, 83
Mich App 505; 268 NW2d 703 (1978); Mielke v Michigan Millers
Mutual Ins Co, 82 Mich App 721; 267 NW2d 165 (1978), rev'd 406
Mich 858; 275 NW2d 553 (1979); Ottenwess v Hawkeye-Security Ins
Co, 84 Mich App 292; 269 NW2d 570 (1978), rev'd 408 Mich 164; 289
NW2d 708 (1980); Hubert v Citizens Ins Co of America, 88 Mich App
710; 279 NW2d 48 (1979); Lindsey v Hartford Accident & Indemnity
Co, 90 Mich App 668; 282 NW2d 440 (1979); Brumfield v Detroit
Automobile Inter-Insurance Exchange, 89 Mich App 1; 279 NW2d 293
(1979); Wolford v Travelers Ins Co, 92 Mich App 600; 285 NW2d 383
(1979); Neumann v Transit Casualty Co, 96 Mich App 472; 292 NW2d
555 (1980); O'Donnell v State Farm Mutual Automobile Ins Co, 70
Mich App 487; 245 NW2d 801 (1976), rev'd 404 Mich 524; 273 NW2d
829 (1979); Workman v Detroit Automobile Inter-Insurance Exchange,
404 Mich 477; 274 NW2d 373 (1979); Mathis v Interstate Motor
Freight System, 408 Mich 164; 289 NW2d 708 (1980).

[16] Exceptions include Workman v Detroit Automobile Inter-Insur-

benefits at issue have been social security survivors' loss benefits and workers' compensation benefits.

In the leading case concerning § 3109(1), *O'Donnell v State Farm Mutual Automobile Ins Co*, 404 Mich 524; 273 NW2d 829 (1979), this Court sustained the constitutional validity of the mandatory set-off, confirming that social security survivors' benefits are required to be subtracted from § 3108[17] no-fault survivors' benefits. We observed that government benefits provided as a result of the same accident for which no-fault benefits are also payable, and which serve the same purpose as no-fault benefits, are within the scope of § 3109(1); however, we emphatically stated that our decision in *O'Donnell* "does not purport to encompass other possible government benefits". *O'Donnell, supra*, 538.

In *Mathis v Interstate Motor Freight System*, 408 Mich 164; 289 NW2d 708 (1980),[18] we extended our holding in *O'Donnell* to workers' compensation benefits, which we found to be constitutionally subject to the mandatory set-off of § 3109(1).

The Court considered the application of § 3109(1) to somewhat atypical benefits, Medicaid benefits, in *Workman v Detroit Automobile Inter-Insurance Exchange*, 404 Mich 477; 274 NW2d 373 (1979). However, since we ascertained that Workman was statutorily disqualified from receiving Medicaid benefits because of her eligibility for no-fault benefits, we declined to decide the issue, or otherwise to express an "opinion with respect to the propriety

---

*ance Exchange*, 404 Mich 477; 274 NW2d 373 (1979) (Medicaid benefits), and *Neumann v Transit Casualty Co*, 96 Mich App 472; 292 NW2d 555 (1980) (supplementary medical insurance benefits, *i.e.*, Part B of Medicare).

[17] MCL 500.3108; MSA 24.13108.

[18] *Hawkins v Auto-Owners Ins Co*, *Ottenwess v Hawkeye-Security Ins Co* and *In re Certified Questions (Joseph v Transport Indemnity Co)* were decided with *Mathis*.

of a set-off of redundant, accident-related, *ex gratia* governmental transfer coverage", *Workman, supra,* 486.

The legislative history of § 3109(1) was adequately detailed in *O'Donnell, supra,* 544-545:[19]

"The history of § 3109(1) indicates that the Legislature's intent was to require a set-off of those government benefits that duplicated the no-fault benefits payable because of the accident and thereby reduce or contain the cost of basic insurance.

"In a letter to the Governor from the Commissioner of Insurance analyzing a series of proposed no-fault bills introduced in 1971, none of which contained a set-off provision, the Commissioner criticized the bills because they tended to 'increase the duplication and overlap between auto insurance and other insurance programs, sick leave programs and social security'. Subsequent bills did contain set-off provisions. The final version of § 3109(1) was similar to an amendment suggested by the Commissioner. According to the Commissioner, the purpose of the amendment was 'to provide a more complete and effective coordination of benefits between Michigan auto insurance and the benefits provided by the laws of all the states and the federal government'. As noted by Justice WILLIAMS in his opinion in this case, the Commissioner's comments 'make clear that the purpose of the § 3109(1) statutory scheme was framed in terms of maintaining or reducing premium costs for all insureds through the elimination of duplicative benefits recovery'."

The second provision of the no-fault act relevant to our discussion herein is § 3109a:

"An insurer providing personal protection insurance benefits shall offer, at appropriately reduced premium rates, deductibles and exclusions reasonably related to

---

[19] See, also: Gretzinger, *O'Donnell v State Farm Mutual Insurance Co: A Judicial Attempt to Amend Michigan's No-Fault Act,* 1977 DCL Rev 187, 191-195.

other health and accident coverage on the insured. The deductibles and exclusions required to be offered by this section shall be subject to prior approval by the commissioner and shall apply only to benefits payable to the person named in the policy, the spouse of the insured and any relative of either domiciled in the same household."[20]

In contrast with § 3109(1), § 3109a has been seldom mentioned, much less construed. *Nyquist v Aetna Ins Co,* 84 Mich App 589; 269 NW2d 687 (1978), *aff'd* 404 Mich 817; 280 NW2d 792 (1979), merits our attention. In *Nyquist,* nine named plaintiffs brought an action against Aetna to recover no-fault benefits withheld by Aetna because plaintiffs' hospitalization expenses had been paid for by Blue Cross-Blue Shield, and because plaintiffs had paid reduced no-fault premiums in electing a coordination of benefits. Plaintiffs principally asserted that Blue Cross-Blue Shield was not "insurance" and therefore did not come within the purview of § 3109a. The Court of Appeals responded:

"[P]laintiffs' argument is untenable for three reasons.

"First, the legislative history of this provision demonstrates that coordination of Blue Cross-Blue Shield benefits with personal injury insurance protection was a primary concern * * *.

* * *

"We also note that § 3109a uses the word 'coverage' rather than 'insurance'; the use of the broader term militates against plaintiffs' restrictive reading of the section at issue.

"Secondly, documents that were part of the record below show that the Commissioner and Deputy Commissioner of Insurance have taken the position that medical and hospitalization plans such as Blue Cross-

---

[20] MCL 500.3109a; MSA 24.13109(1).

Blue Shield fall within § 3109a. We give particular weight to the interpretations of those charged with the implementation and enforcement of a statute. See *Boyer-Campbell Co v Fry,* 271 Mich 282; 260 NW 165 (1935).

"Finally, the plain purpose of § 3109a was to reduce premiums by eliminating duplicate coverage. It is undisputed that personal injury insurance benefits overlap with medical and hospitalization benefits. Thus, plaintiffs' restrictive reading of § 3109a would subvert the clear purpose of the legislation." *Nyquist, supra,* 591-592.

The Court of Appeals, in a second case discussing the permissive set-off provision, *Orr v Detroit Automobile Inter-Insurance Exchange,* 90 Mich App 687; 282 NW2d 177 (1979), held that sick leave accumulated by an employee was not health and accident coverage as set forth in § 3109a.[21]

Although our primary focus in *O'Donnell* was upon the constitutionality of § 3109(1)'s mandatory set-off, we also concluded that § 3109a is constitutional, commenting:

"Section 3109(1) did not attempt to address the problem of overlapping no-fault and private health or accident insurance benefits. Soon after the No-Fault Act was passed by the Legislature, however, an attempt was made to fine-tune the set-off provisions so that this kind of duplication could be reduced while still permitting persons with needs exceeding the benefits provided by no-fault insurance to obtain the extra coverage they required. The Legislature enacted § 3109a * * *.

* * *

"Although the Legislature did not choose to make this set-off mandatory, as it had done with § 3109(1)'s government benefit set-off, this distinction is justified by the perceived necessity of making it possible for persons

---

[21] See *Porter v Michigan Mutual Liability Co (On Remand),* 97 Mich App 281; 293 NW2d 799 (1980), for additional mention of § 3109a.

with greater needs to obtain the coverage they require and pay reduced rates on the no-fault insurance through deductibles and exclusions approved by the Commissioner. That some persons can still slip through the colander of § 3109a and receive additional benefits *does not mean the statute is unconstitutional.* Mathematical precision is neither possible nor required.

"Section 3109a promotes the valid legislative objective of reducing duplicative benefits; the means chosen is rationally related to that end; and the distinctions drawn are supported by a rational basis. This statute is also constitutional." *O'Donnell, supra,* 550-551.

Crucial to our analysis in this case are two documents which tend to clarify the intent of the Legislature in enacting § 3109a. The first is a letter addressed to the Governor from the Commissioner of Insurance[22] which explains the purpose of 1974 House Bill 5724[23] and summarizes the arguments in favor of the bill:

"The bill requires automobile insurers to offer to their insureds personal protection insurance benefits with exclusions and deductibles which relate to other health and accident coverage on the insured. Offer of such deductibles and exclusions will virtually eliminate the current overlap of coverage which occurs when an insured has both the no-fault personal protection benefits and other health and accident coverage which, like the personal protection benefits, covers medical expenses connected with auto accidents and other accidents.

* * *

"The bill will eliminate or drastically reduce the incidence of overlapping coverage for medical expenses related to automobile accidents and hence reduce the cost of such insurance to the insured.

"The bill will require that persons covered by the

---

[22] Letter dated February 26, 1974 from Daniel J. Demlow, Commissioner of Insurance, to Governor William G. Milliken.

[23] Subsequently enacted into 1974 PA 72, the present MCL 500.3109a; MSA 24.13109(1).

Medicare program be given personal injury protection benefits at reduced rates. Currently, some automobile insurers do not provide reduced personal protection rates to persons covered under the Medicare program. The only reduction available to all retired persons is due to their lower income not their Medicare benefits, if any.

"The bill would make it possible to eliminate the current situation in which persons insured under accident and health policies which include medical expense and loss of wages benefits may collect benefits from such coverage and from their no-fault personal protection benefits. This double recovery is contrary to public policy in that it is wasteful and can result in an insured receiving more income when recuperating than when working.

"The bill gives each consumer the chance to select or reject deductibles based on his existing non-automotive health and accident coverage. Currently, insurers writing approximately 90% of Michigan's no-fault coverage do not allow the consumer to make such a choice."[24]

The second item is an analysis of HB 5724 prepared by the House Insurance Committee,[25] which largely echoes the arguments and purposes set forth in the Insurance Commissioner's letter to the Governor:

*"The Apparent Problem to Which the Bill Addresses Itself:*

"Since the advent of compulsory no-fault automobile insurance last October, auto insurance premiums have not been reduced as some persons had anticipated. Many believe the average driver is overbuying in regards *[sic]* to accident and medical insurance since no-fault coverage overlaps with portions of the medical

[24] Letter from Insurance Commissioner Demlow to Governor Milliken, *supra,* 1-2.

[25] Analysis of 1974 House Bill 5724 prepared by the Analysis Section of the House of Representatives Insurance Committee, containing material complete to February 27, 1974.

coverage offered by the private accident and health insurers and the group plans of Blue Cross and Blue Shield. Some persons claim Michigan residents should not be required to pay for this duplicate coverage and that automobile insurers should offer deductions and exclusions at reduced premiums to those who pay for similar coverage under other health and accident plans. Further, many contend this elimination of duplicate coverage by the no-fault insurers would result in a substantial savings [sic] to Michigan drivers.

\* \* \*

*"Argument For:*

"The bill would save millions of dollars for Michigan drivers and would offer them an opportunity to eliminate their duplicate, overlapping insurance coverage since automobile insurers would be required to offer deductibles of exclusions which wrap-around a policyholder's health and accident coverage. No-fault insurers would offer these deductions at reduced premiums, and State insurance officials estimate the 5 to 6 million Michigan drivers could save $100 million annually.

*"Argument For:*

"Passage of the bill would create more flexibility in health and accident coverage by offering consumers an insurance option which the vast majority of underwriters operating in Michigan do not offer. Further, if the Blue Cross/Blue Shield plans gain approval for their proposed modifications, the consumer seeking health and accident coverage will have yet another option from which to choose. The bill does not make it mandatory for an insurance buyer to select these deductibles and exclusions so many could still opt for overlapping coverage.

*"Argument For:*

"The skyrocketing hospital and medical costs could be contained to a greater extent with health and accident as the primary coverage since these policies, like the Blue Cross/Blue Shield plans, have established limits on their reimbursement of doctor and hospital expenses. A physician who knows his or her patient has

unlimited medical coverage has no incentive to keep the doctor bill at a minimum."[26]

In summary, § 3109(1) requires a subtraction of government benefits from no-fault benefits otherwise payable. The provision exists to eliminate duplicative recovery and to contain insurance costs. Reduction of insurance costs is implemented under § 3109(1) by spreading the savings among all no-fault consumers. This Court has thus far found that social security survivors' benefits and workers' compensation benefits are subject to the mandatory set-off provision.

Section 3109a permits a set-off of "other health and accident coverage" at the insured's option. This provision, like § 3109(1), serves to eliminate duplicative recovery and to contain or reduce insurance costs; additionally, it allows individuals to tailor their insurance coverage to their own special needs. Cost reduction is implemented under § 3109a on an individual basis rather than in blanket fashion. Blue Cross-Blue Shield has been deemed one form of "other health and accident coverage" qualifying for permissive coordination of benefits under § 3109a.

## III

Medicare has been variously defined as " 'social welfare legislation passed by the Congress to aid the general health and welfare of those over 65 years of age' ", *Imvris v Michigan Millers Mutual Ins Co*, 39 Mich App 406, 410; 198 NW2d 36 (1972),[27] and as "a federally funded and adminis-

---

[26] House Insurance Committee Analysis, *supra*, 1.

[27] But see *Witherspoon v St Paul Fire & Marine Ins Co*, 86 Wash 2d 641, 646; 548 P2d 302, 306 (1976): "Neither Part A nor Part B Medicare constitute a 'welfare plan.' "

tered program created by Title XVIII of the Social Security Act providing hospital and outpatient insurance benefits to elderly persons", *American Medical Ass'n v Weinberger,* 395 F Supp 515, 518 (ND Ill, 1975). The 1965 enactment[28] of Medicare into the Social Security Act "established the federal government as the largest health insurer in the United States". *American Medical Ass'n, supra,* 518.

Medicare is a two-part program, each part distinct with regard to benefits, coverage, financing and administration.[29] Part A of Medicare, known as the "hospital coverage" is incorporated into the existing social security structure,[30] and is designed to assist in the payment of services for inpatient hospital care, skilled nursing care and certain home health care.[31] To be eligible for Part A benefits, an individual must be aged 65 or older, and must meet conditions for cash social security benefits.[32] Most persons aged 65 or older automatically qualify for Part A benefits. Part A coverage is wholly financed through universal and mandatory contributions from employers, employees, and self-employed people, and thus entails no monthly premium on behalf of a qualifying participant.[33] Persons who meet the age requirements and who

[28] Added July 30, 1965, 79 Stat 291, 42 USC 1395 *et seq.*

[29] *Witherspoon, supra,* 644, citing H. Somers & A. Somers, Medicare and the Hospitals—Issues and Prospects (Washington, DC: The Brookings Institution, 1967), pp 19-20, and referring the reader to Department of Health, Education & Welfare, Pub No SSA 74-10050, *Your Medicare Handbook (1974),* 44-45. (Note that effective May 4, 1980, HEW has been redesignated the Department of Health and Human Services.)

[30] *Witherspoon, supra,* 644.

[31] 42 USC 1395d; Department of Health, Education & Welfare, Pub No SSA 79-10043, *A Brief Explanation of Medicare* (May, 1979), 4-6.

[32] 42 USC 1395c; *Witherspoon, supra,* 645.

[33] HEW, *A Brief Explanation of Medicare, supra,* 13.

are enrolled in Part B, but who have not worked long enough to satisfy the other conditions for participation in Part A, may purchase Part A coverage by paying a monthly premium which is said to represent the cost of Medicare hospital protection.[34] Amounts paid as employee and self-employment taxes under the Internal Revenue Code do not qualify as amounts paid for insurance, and are not deductible as medical expenses.[35]

Participation in Part B of the Medicare program, termed the "medical coverage" or the "physician coverage" is voluntary, and is open to any individual aged 65 or older,[36] except nonresident aliens.[37] In contrast with Part A coverage, some individuals must apply for Part B coverage to be eligible for it.[38] Moreover, delay in applying for Part B coverage results in a 10% increase in the amount of monthly premium for each year of delay.[39] Once enrolled in Part B, an individual may cease participation either by filing a written no-

[34] According to Department of Health, Education & Welfare, Pub No SSA 05-10050, *Your Medicare Handbook (1980)*, 45, "[t]he basic hospital insurance premium is $69 a month through June 30, 1980. It will increase to $77 a month for the 12-month period starting July 1, 1980. This premium represents the present cost of Medicare hospital insurance protection".

[35] *Witherspoon, supra*, 645; Rev Rul 66-216, 1966-2 Cum Bull 100. However, voluntary payments made by a participant for Medicare A coverage qualify as amounts paid for medical insurance under IRC § 213. Rev Rul 79-175, 1979-1 Cum Bull 117.

[36] HEW, *A Brief Explanation of Medicare, supra*, 8; 42 USC 1395j; 42 USC 1395o; *Witherspoon, supra*, 645.

[37] *Mathews v Diaz*, 426 US 67; 96 S Ct 1883; 48 L Ed 2d 478 (1976).

[38] A person receiving social security or railroad retirement benefits is automatically enrolled in Part B of Medicare at the same time he or she becomes eligible for Part A benefits, unless he or she indicates that participation in Part B is not desired. Automatic Part B enrollment does not occur for individuals who are 65 but are not eligible to participate in Part A, or who have permanent kidney failure, or who live in Puerto Rico or foreign countries. HEW, *A Brief Explanation of Medicare, supra*, 8-9; 42 USC 1395p.

[39] 42 USC 1395r; HEW, *Your Medicare Handbook (1980), supra*, 45.

tice, or by failing to pay the premium.[40] Former
Part B participants are permitted to re-enroll only
once, and at a higher premium.[41] Part B of Medi-
care pays 80% of reasonable charges in excess of a
moderate deductible for physicians' services, out-
patient hospital services, home health visits, out-
patient physical therapy and speech pathology
services, ambulance services, some chiropractic
services, and other physician-prescribed health and
medical services.[42] Financing of Part B is accom-
plished through an exaction of monthly premiums
of a uniform amount from enrollees[43] and, at a
minimum, matching contributions from the fed-
eral general appropriations fund.[44] Premiums, paid
either by direct payment or by automatic deduc-
tion from the participant's social security benefit
check, can be increased only if there has been a
general increase in social security cash benefits
during the previous year.[45] Because any premium
increase cannot exceed the percentage increase in
cash benefits, the share assumed by the federal
government is necessarily enlarged.[46] Part B pre-
miums qualify as amounts paid for insurance cov-
ering medical care under the Internal Revenue
Code, and are deductible as medical expenses.[47]
Correlatively, Part B benefits received are in the

[40] 42 USC 1395q; HEW, *Your Medicare Handbook (1980), supra,* 46.

[41] 42 USC 1395p; HEW, *Your Medicare Handbook (1980), supra,* 46.

[42] HEW, *A Brief Explanation of Medicare, supra,* 9-11.

[43] According to HEW, *Your Medicare Handbook (1980), supra,* 44,
"[t]he basic medical insurance premium is $8.70 a month through
June 30, 1980. It will increase to $9.60 a month for the 12-month
period starting July 1, 1980".

[44] *Witherspoon, supra,* 645-646.

[45] HEW, *A Brief Explanation of Medicare,* 13.

[46] "For the year starting July 1, 1980, the federal government will
pay more than two-thirds of the premium cost of medical insurance."
HEW, *Your Medicare Handbook (1980), supra,* 44.

[47] See IRC § 213(a); Rev Rul 66-216, 1966-2 Cum Bull 100; *Wither-
spoon, supra,* 646.

nature of medical insurance proceeds, and are excluded from gross income under federal income tax provisions.[48]

## IV

We first address defendant's contention that the phrase "other health and accident coverage" contained in § 3109a refers to "coverage *other* than that provided or required to be provided under the laws of any state or the federal government",[49] *i.e.,* coverage other than the governmental benefits of § 3109(1) which, defendant posits, include Medicare benefits. For several reasons, we believe that such a construction is incompatible with and unwarranted by a common-sense reading of the text of § 3109a. Section 3109a makes no internal reference, express or implied, to § 3109(1); thus an interpretation dependent upon language set forth in § 3109(1) is pointless. Furthermore, the fact that "other health and accident coverage" immediately follows a reference to "personal protection insurance benefits" compels a conclusion that "other health and accident coverage" clearly means coverage other than personal protection insurance benefits payable under any no-fault policy.

## V

Defendant asserts that Medicare benefits are unquestionably within the purview of § 3109(1) because they are provided pursuant to federal law, are administered by agencies of the federal govern-

---

[48] See IRC § 104(a); Rev Rul 70-341, 1970-2 Cum Bull 31 (revoked in part by Rev Rul 79-173, 1979-1 Cum Bull 86, to the extent that it had ruled that basic benefits were includable in determining support for purposes of IRC §§ 151 and 152—the revocation is not pertinent to our discussion here); *Witherspoon, supra,* 646.

[49] Defendant's Brief on Appeal, 4.

ment, and are funded by federal tax schemes. Accordingly, Medicare payments do not qualify for § 3109a's permissive set-off because they are not private benefits, as characterized by this Court in *O'Donnell.* Defendant believes that the plain meaning of § 3109(1), coupled with the intent of the Legislature in enacting the mandatory set-off provision, necessitate a conclusion that Medicare benefits are government benefits for purposes of § 3109(1).

Defendant's analysis is certainly plausible, but it is not eminently persuasive.

Our holding is not predicated upon the governmental/private benefits dichotomy as urged by defendant. However enticing such a simple resolution might be, we are convinced that it is not the correct one insofar as Medicare benefits are concerned. It is indisputable that § 3109(1) contemplates benefits derived from a collateral governmental source; it is not equally indisputable that § 3109a applies only to "other health and accident coverage" obtained from a collateral private source. On its face, § 3109a is not so limited. While we acknowledge that the distinction between private and governmental benefits repeatedly surfaced throughout our discussion in *O'Donnell,* and that we there characterized § 3109a as relating to private benefits, suffice it to say that our concerns in *O'Donnell* were radically different from those confronting us here, and that we precisely confined *O'Donnell* to its facts.

The legislative history of § 3109a suggests that the Legislature, in leaving the phrase "other health and accident coverage" unmodified by the word private, intended to give unrestrained application of § 3109a to health and accident coverage from whatever source. The analysis of HB 5724

prepared by the House Insurance Committee indicates that the bill would eliminate duplicate cover-' age by making private accident and health insurance, as well as the group plans of Blue Cross and Blue Shield, primary sources of reimbursement for accident-related medical and hospital expenses. Thus, both private and non-private[50] plans were within the scope of the bill. Further, in his letter to the Governor regarding HB 5724, the Insurance Commissioner expressed his view that Medicare recipients must be offered no-fault personal injury protection benefits at reduced rates under the bill. We presume that the Legislature reflected upon the Insurance Commissioner's position in enacting § 3109a, and we give some weight to the interpretation given a statute by the official charged with its enforcement. *Magreta v Ambassador Steel Co,* 380 Mich 513, 519; 158 NW2d 473 (1968).

That participants in the Medicare program qualify for permissive coordination of benefits under § 3109a, rather than for mandatory coordination of benefits under § 3109(1), is forcefully demonstrated by the Legislature's deliberate use of distinct words to describe the items subject to set-off in the two provisions. Section 3109(1), enacted as a portion of the original no-fault act, is clearly addressed to government *benefits.* In a general sense, benefits are those things which promote an indi-

---

[50] Blue Cross and Blue Shield, provided under the auspices of state law, MCL 550.301 *et seq.,* 550.501 *et seq.;* MSA 24.591 *et seq.,* 24.621 *et seq.,* is not technically a private form of health and accident insurance. BC/BS has been described as a "non-profit, tax-exempt 'charitable and benevolent institution' incorporated pursuant to special enabling legislation enacted by the Michigan Legislature in 1939, for the purpose of providing a mechanism for broad health care protection to the people of the State of Michigan." *Blue Cross & Blue Shield of Michigan v Insurance Comm'r,* 403 Mich 399, 415-416; 270 NW2d 845 (1978). It is interesting to note that Blue Shield of Michigan presently handles medical insurance claims for Michigan Medicare participants. HEW, *Your Medicare Handbook (1980), supra,* 54.

vidual's welfare, advantage or profit. See *Salisbury v United States,* 377 F2d 700, 706 (CA 2, 1967); *State ex rel Hardesty v Aracoma-Chief Logan No 4523, Veterans of Foreign Wars of the United States, Inc,* 147 W Va 645, 650; 129 SE2d 921, 924-925 (1963). In contrast to § 3109(1) is the later-enacted § 3109a, which more specifically speaks to other health and accident *coverage.* "Coverage", a word of precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance. See *D'Angelo v Cornell Paperboard Products Co,* 59 Wis 2d 46, 51; 207 NW2d 846, 849 (1973); *Freimuth v Glens Falls Ins Co,* 50 Wash 2d 621, 625; 314 P2d 468, 471 (1957). In discussing whether an employee's sick leave program constituted "other health and accident coverage" under § 3109a, the Court of Appeals in *Orr, supra,* 690, commented:

"The noninadvertent use of the word 'coverage' in this section of the no-fault act, when the rest of the no-fault act refers to benefits, clearly indicates that the Legislature intended § 3109a, deductibles and exclusions, to be limited to health and accident *insurance* coverage upon the insured."

We join in the belief of the Court of Appeals that the Legislature's choice of the word "coverage" to delineate the perimeters of § 3109a was "noninadvertent". We are also of the view that the Legislature's enactment of § 3109a, which is narrowly limited to "coverage" and which is not expressly confined to private forms of such "coverage", evinces an intent to provide unique treatment to health and accident insurance, as opposed to other perhaps equally duplicative "benefits".

Medicare is "other health and accident coverage" qualifying for § 3109a's permissive set-off. We perceive no just reason to differentiate Medicare from other, more traditional, forms of health and accident coverage which irrefutably are within the scope of § 3109a. Just like any so-called private insurer, Medicare compensates providers of medical and hospital services on behalf of participants who require health care.[51] It is inconsequential that in other contexts[52] Medicare has been deemed not to be insurance in the usual sense of the term: the same has been said of Blue Cross and Blue Shield plans which, according to *Nyquist,* fall within § 3109a. *Blue Cross & Blue Shield of Michigan v Insurance Comm'r,* 403 Mich 399; 270 NW2d 845 (1978).

By construing § 3109a to embrace Medicare ben-

---

[51] Part B of Medicare is also akin to traditional forms of health and accident insurance because a contractual sort of relationship arises between the provider of payment and the premium-paying participants. See, generally, *Witherspoon, supra.* Although it might be said that Part A of Medicare departs from usual modes of insurance because premiums are not directly paid by the participant, we do not exclude Part A of Medicare from application of § 3109a on the basis of this distinction. Part A of Medicare is rendered no less a form of "health and accident coverage" by reason of its peculiar financing structure.

[52] *Imvris, supra* (Medicare is not "individual, blanket or group accident, disability or hospitalization insurance" within the exclusionary clause of a policy providing payment for medical expenses); *Witherspoon, supra* (Medicare is not within the deductible amount of a personal catastrophe liability policy; nor does it come within the terms of an exclusion for charges paid for or reimbursable by or through a governmental unit); *Wojtkowski v Hartford Accident & Indemnity Co,* 27 Ariz App 497; 556 P2d 798 (1976) (Part A of Medicare is not included within a policy's set-off for medical expenses paid by individual, blanket or group accident insurance, but Part B of Medicare constitutes group insurance within the exclusionary clause). See, also: *Jones v Aetna Casualty & Surety Co,* 497 SW2d 809 (Mo App, 1973). Note that the explanatory brochures issued by the Department of Health, Education & Welfare regarding Medicare typically refer to both Part A and Part B of Medicare as "insurance". See, *e.g.,* HEW, *A Brief Explanation of Medicare, supra.*

efits,[53] we do no violence to the legislative intent underlying the provision; indeed, our interpretation comports with and fosters the purposes of § 3109a. Like § 3109(1), § 3109a exists to eliminate duplicative recovery and to contain or reduce insurance costs. These worthy goals are promoted by including Medicare within § 3109a, since, as Medicare participants opt to coordinate their Medicare benefits with their no-fault benefits, they obtain a direct reduction of no-fault premiums and forego dual recovery. However, § 3109a also recognizes that certain persons possess unique requirements which necessitate additional health and accident coverage; hence the optional facet of § 3109a's coordination of benefits. Medicare's exclusive application to the elderly population,[54] which frequently has an expanded need for health care, provides a convincing reason for including it within § 3109a.

## VI

Medicare constitutes "other health and accident coverage" within the meaning of § 3109a of the no-fault act. Thus, payments made to health care providers pursuant to the Medicare program for expenses arising out of the same accident for which no-fault benefits are also payable *may* be subtracted from payable no-fault benefits *at the option of the insured.* Since plaintiff in the instant case did not elect to coordinate his Medicare benefits with his no-fault benefits, payments made on

---

[53] Our characterization of Medicare receipts as "benefits" does not contradict our determination that such receipts do not constitute governmental "benefits", as that term is employed in § 3109(1).

[54] By 1968, approximately 18.6 million elderly persons were covered by both Parts A and B of Medicare; by 1976, the number of elderly participants had grown to approximately 23 million. *Witherspoon, supra*, 653.

his behalf by the Medicare program may not be subtracted from the no-fault benefits due under the no-fault policy issued to him by defendant. We do not reach the constitutional issue presented on appeal, nor do we express an opinion with regard to the inclusion of other possible forms of health and accident coverage within the purview of § 3109a.

The decision of the Court of Appeals is reversed.

WILLIAMS, FITZGERALD, and BLAIR MOODY, JR., JJ., concurred with COLEMAN, C.J.

LEVIN, J. *(concurring in part; dissenting in part).* The question in this case is whether, when an insured has overlapping Medicare and no-fault automobile liability insurance coverage, the no-fault insurer must pay benefits that duplicate benefits paid by Medicare. The Court's decision that duplicative payments must be made answers the question in a manner that fails to implement the Legislature's efforts to reduce the costs of no-fault insurance to Michigan consumers by eliminating duplication.

Section 3109(1) of the no-fault automobile liability act[1] provides that no-fault benefits otherwise payable are to be reduced by benefits provided under state or federal law. Medicare benefits are provided under the federal Social Security Act, and thus, contrary to the decision of the Court, are to be subtracted from no-fault benefits otherwise payable. The basic goal of § 3109(1) is to reduce the cost of no-fault insurance by eliminating the requirement to pay benefits which duplicate benefits already received from the government; the Legislature anticipated that by reducing the benefits that

---

[1] MCL 500.3109 subd (1); MSA 24.13109 subd (1).

had to be paid by no-fault insurers, it would reduce the premiums no-fault insurers had to collect.

Section 3109a, an amendment enacted two years after the no-fault act,[2] carries this effort a step further. It requires no-fault insurers to offer policies whose coverage is coordinated with the insured's other insurance coverage, and to reduce premiums commensurate with the reduced coverage. In other words, no-fault coverage can thereby be reduced to the extent the insured is already covered under another policy, so the insured is not required to double-insure.

Thus, both §§ 3109(1) and 3109a attempt to coordinate benefits, § 3109(1) mandatorily and § 3109a at the option of the insured. Both sections have the same purpose, to reduce the cost of no-fault insurance by removing the obligation to pay benefits which merely duplicate benefits received for the same loss from another source.

Despite the similarity of approach and purpose, which would seem to indicate that § 3109a was intended to continue and expand the policy of § 3109(1) rather than to preempt it, the Court concludes that § 3109a has by implication partially repealed § 3109(1). The Court reasons that because Medicare is insurance coverage whose coordination with no-fault coverage is at the option of the insured under § 3109a, its benefits cannot be subject to the mandatory coordination required by § 3109(1).

We do not know why the Legislature made coordination under § 3109a optional. Unlike the majority, however, I am not persuaded that part of the purpose for doing so was to repeal by implication the mandatory coordination of duplicative governmental benefits required by § 3109(1). Such

---

[2] MCL 500.3109a; MSA 24.13109(1).

a construction stands the basic purpose of § 3109a on its head. Instead of helping to further *eliminate* duplication, § 3109a thereby works to *allow* duplication heretofore eliminated under § 3109(1).

It is not necessary to construe §§ 3109a and 3109(1) as mutually exclusive; both can be given full operative effect. Medicare payments, as a governmental benefit under § 3109(1), are to be subtracted from no-fault benefits otherwise payable. And no-fault insurers, under § 3109a, must offer, at appropriately reduced premiums, deductibles and exclusions reasonably related to the insured's Medicare coverage.[3]

Since the two provisions are not necessarily inconsistent, and since giving full effect to each furthers their basic purpose of eliminating duplication, the sections should be so construed. This construction coincides with that of the Commissioner of Insurance, whose agency has the respon-

[3] Such a construction is not novel. See HR 13048 (95th Cong, 2d Sess, June 8, 1978) "Standards for No-Fault Motor Vehicle Accidents Benefits Act", which provides:

"Sec. 109. AVOIDANCE OF DUPLICATION.

"(a) IN GENERAL.—(1) An approved State plan shall establish, and the commissioner shall implement, a provision that fairly and equitably—

"(A) eliminates any unintended duplication in the benefits otherwise available with respect to a victim or any survivor with respect to any injury; and

"(B) passes on the cost savings which result from that elimination to all persons who would otherwise be entitled to receive those duplicative benefits, or utilizes the savings to defray the cost of other benefits.

\* \* \*

"(c) REDUCTION FOR BENEFITS RECEIVED FROM GOVERNMENTS.—An approved State plan shall provide that all benefits (less reasonably incurred collection costs) that an individual receives pursuant to entitlement, or is entitled to receive, with respect to an injury, from—

"(1) social security (except benefits under title XIX of the Social Security Act [Medicaid]); \* \* \*

"shall be subtracted in calculating basic no-fault benefits, unless the law authorizing or providing for those benefits makes them secondary to or duplicative of basic no-fault benefits."

sibility of administering the act, as revealed by the bulletin issued upon passage of § 3109a in which the commissioner explained procedures for complying with § 3109a.

It may be considered inequitable to allow a no-fault insurer the windfall of collecting premiums to cover losses that will actually be reimbursed by Medicare. Courts, however, must resist construing statutes of such broad remedial intent as the no-fault act solely to reach an equitable result in the case at hand. Individual equity may be at the expense of the society-wide equity of the act as a whole, as conceived by the Legislature. Such may be the result here. Although the Court's construction disallows a windfall to no-fault insurers, the overall cost of no-fault insurance will rise because no-fault benefits payable will be reduced under § 3109(1) only by those governmental benefits which cannot be characterized as resulting from "coverage" under § 3109a.

The failure of insureds to accept the required offerings of reduced coverage, at a reduced premium, to reflect losses that will be reimbursed by Medicare, is more likely the result of the failure of the insurance agent to offer and explain such coordination than the result of an informed choice to double-insure. Few people are willing to pay for redundant coverage of medical expenses.

If more is needed to enforce § 3109a's requirement to offer coordinated coverage, the Legislature or the Commissioner of Insurance may provide it. Moreover, while the construction by the Court removes the no-fault insurer's windfall, it provides no actual encouragement for a no-fault insurer to offer coordinated coverage under § 3109a. As long as the premiums being collected yield a profit beyond what must be paid out in benefits, no-fault

insurers can be expected to continue to sell the full coverage regardless of the fact that the benefits paid out duplicate those of Medicare.

# I

Section 3109(1) was part of the act as originally enacted. Section 3109a was added two years later. When construing amendments, "regard must be had for the law as it was, for the effect and purpose of the amendments changing it, and all provisions must be given effect and reconciled with each other if possible. Amendments dominate and modify the former law, in case of conflict".[4]

# A

Thus the first step in the analysis—one omitted in the opinion of the Court—is to determine whether Medicare was a government benefit requiring setoff under § 3109(1) before the addition of § 3109a.

Section 3109(1) is based on two model acts— UMVARA[5] and MVBPIA[6]—both of which require the setoff of Medicare benefits.

MVBPIA requires the setoff of *all* benefits received from sources other than no-fault and "added protection" insurance in determining net loss. "Added protection" is defined as "insurance, optional to the insured, providing benefits beyond

---

[4] *People v Johnson,* 270 Mich 622, 623-624; 259 NW 343 (1935); 1A Sands, Sutherland's Statutory Construction, § 22.35, p 197.

[5] Uniform Motor Vehicle Accident Reparations Act. See 14 ULA, Civil Procedural and Remedial Acts, pp 41 *et seq.* UMVARA was drafted by the National Conference on Uniform State Laws under a contract with the United States Department of Transportation.

[6] Motor Vehicle Basic Protection Insurance Act, see Keeton & O'Connell, Basic Protection for the Traffic Victim: A Blueprint for Reforming Automobile Insurance (Little, Brown & Co, 1965).

basic * * * [no-fault] insurance on terms and conditions consistent with the provisions of * * * [the particular no-fault plan]". MVBPIA thus makes *all* collateral benefits, regardless of their source, primary unless the benefit reimburses loss not covered under no-fault insurance.

UMVARA requires the setoff of only "social security, workmen's compensation, and any state-required temporary nonoccupational disability insurance". Thus, under UMVARA, the source of the benefit was used to distinguish which benefits were to be set off.

The Michigan act, by distinguishing benefits required to be set off by their source, is similar to UMVARA. Rather than provide a particularized list, however, the Michigan act generalizes, speaking of benefits provided or required to be provided under state or federal law.

This Court found workers' compensation to be a benefit within the intendment of the Michigan act's general language in *Mathis v Interstate Motor Freight System.*[7] In *O'Donnell v State Farm Mutual Automobile Ins Co,*[8] we reached the same conclusion as to survivors' benefits under Social Security.

Medicare is a Social Security benefit.[9] The commentary to UMVARA makes it clear that even under its more restrictive language, Medicare was within the benefits intended to be set off: " 'Social Security' includes all benefits under the federal Social Security Act, including Medicare and disability benefits."[10]

---

[7] *Mathis v Interstate Motor Freight System,* 408 Mich 164; 289 NW2d 708 (1980).

[8] *O'Donnell v State Farm Mutual Automobile Ins Co,* 404 Mich 524; 273 NW2d 829 (1979).

[9] 42 USC 401 *et seq.*

[10] Comment to UMVARA § 11(a), 14 ULA, pp 78-79.

There is no reason to suppose that the Michigan Legislature, in enacting a collateral benefits provision modeled primarily on UMVARA, intended by its more general language to exclude Medicare from the required setoff. If anything, the Legislature intended to require setoff of a broader array of benefits than those specified in UMVARA.

I would consider it therefore clear that Medicare benefits are required by § 3109(1) to be set off, unless § 3109(1) was changed by the later addition of § 3109a.

B

I concur in the Court's conclusion that Medicare is "health and accident coverage" within the meaning of § 3109a, and hence that no-fault insurers are required to offer, at appropriately reduced premium rates, deductibles and exclusions to reflect an insured's Medicare coverage. I do not agree, however, that simply because Medicare is coverage within the meaning of § 3109a, its benefits must necessarily be excepted from the mandatory setoff required by § 3109(1).

We should give full effect to both provisions unless some part of § 3109(1) is necessarily inconsistent with § 3109a. The two sections are not mutually exclusive. Governmental benefits required to be set off under § 3109(1) may still be benefits paid pursuant to health and accident coverage for which the insurer must, under § 3109a, offer premium rates reflecting deductibles and exclusions.

The purposes of § 3109a are to facilitate the coordination of no-fault coverage with other coverage on the insured, and to require that the savings derived be passed on to the insured in the form of

lower premiums. The problem addressed by § 3109a was that health and accident policies and no-fault auto policies both provided coverage for the same medical expenses and wage loss. Duplicative premiums were being collected to insure against the same risk, and duplicative benefits were being paid to reimburse the same elements of loss. Section 3109a was added to promote the elimination of such duplication.

One way to eliminate the duplication would have been to make coordination of coverage mandatory under § 3109a. No-fault insurers could have been required to limit their coverage, and premiums, to losses not already covered by the insured's general health and accident insurance, or vice versa. The Legislature, however, chose to make coordination optional, requiring only that no-fault insurers offer coverage with deductibles and exclusions to reflect other coverage.

The opinion of the Court concludes that coordination under § 3109a was not made mandatory because the Legislature wished to provide insureds with the option of obtaining additional insurance coverage. It is one thing to recognize that not making coordination under § 3109a mandatory will allow the purchase of *additional* insurance. It is quite another to conclude that part of the Legislature's purpose was to confer the option of *duplicative* coverage, as distinguished from coverage that *supplements* no-fault insurance, *e.g.,* income protection in excess of the no-fault maximum.[11] Medicare coverage for hospitalization and medical expenses resulting from an auto accident does not supplement but rather necessarily duplicates no-fault coverage, which the opinion of the Court does not expressly recognize.

---

[11] MCL 500.3107(b); MSA 24.13107(b); MCL 500.3108; MSA 24.13108.

Even if not making coordination under § 3109a mandatory reflects a legislative purpose to allow the purchase of additional insurance, and assuring that this purpose was intended to permit the purchase of duplicative rather than supplemental coverage, it requires still another jump to conclude that this legislative purpose extends to giving the option of choosing the very duplication that § 3109(1) expressly bars.

Such a conclusion reverses the basic purpose of § 3109a. Rather than facilitating coordination, § 3109a thereby facilitates not only duplication, but duplication of the very sort barred under § 3109(1).

I am particularly reluctant to extend the legislative purpose identified by the majority so far as to work as an amendment of § 3109(1) in part because there is an alternative, equally plausible, explanation of why coordination of coverage under § 3109a was not made mandatory. To have made coordination mandatory would have required deciding which insurer would be primary—the no-fault insurer or the general health insurer. Only the primary insurer would receive the premium dollars of the insureds. Rather than choose which insurer would be primary, the Legislature may have made coordination optional as a compromise, in effect leaving it to each insured to decide which insurer would be primary.

We are not privy to the give and take of the legislative process during which it was decided not to make coordination of coverage under § 3109a mandatory, nor do we know much about the insurance business or the complexities, real or imagined, which were presented to the Legislature as it attempted to reconcile the objective of reducing the cost of no-fault insurance to consumers with

the desires of both health care insurers and auto
insurers to provide, and receive premiums for,
primary coverage. Unlike the majority, however, I
am not persuaded that the Legislature, in using
language which permits duplicative recovery,
meant to encourage duplicative coverages in the
health care area, and specifically that such pur-
pose extends to an amendment by implication of
§ 3109(1) to eliminate the mandatory setoff of Me-
dicare benefits.

C

I agree with the majority that the insurer's
obligation under § 3109a to offer deductibles and
exclusions for other health and accident coverage
of the insured is not limited to non-governmental
accident and health coverage. Medicare is health
and accident coverage and thus deductibles and
rate reductions must be offered by the insurer.
Medicare benefits, as benefits required to be paid
under state or federal law, nevertheless are within
the scope of § 3109(1).

Perhaps the majority has been swayed by the
inequity of allowing an auto insurer the benefit of
the setoff against benefits it must pay out under
§ 3109(1) when that auto insurer did not reduce
the premium it charged to reflect the savings to be
realized by that setoff. To be sure, reading the
sections as independent results in a windfall for a
no-fault insurer that has not coordinated its cover-
age under § 3109a in light of Medicare, since that
insurer will have collected premiums to insure
against loss that will actually be reimbursed by
Medicare.

Courts must, however, exercise special care
when considering individual claims of hardship or
injustice allegedly caused by a statute with such

broad remedial purposes as the no-fault act. Such society-wide programs almost necessarily work occasional injustice in order to provide a fairer system to the majority. Courts naturally tend to focus on the equities of the case before them; they have limited ability, expertise or authority to assess either the fairness of the entire system or the effect on that system of any individual decision. Yet by attempting to reach a fair result in the case before it, a court may unwittingly sacrifice some measure of the fairness of the program as a whole.

Such is the case here. It may be unfair that the statute deprives the plaintiff of some measure of the benefits he purchased. It is essential, however, to the viability of the no-fault program that the costs of no-fault insurance be restrained. This reduction of costs is the primary purpose of both § 3109(1) and § 3109a.

It should be noted, moreover, that the opinion of the Court, while admittedly removing the no-fault insurer's windfall, provides no more actual encouragement for insurers to coordinate coverage under § 3109a than does my construction. Insurers make money by collecting premiums that will produce revenue in excess of the benefits they must pay. While the opinion of the Court requires insurers to pay all benefits under coverage for which they have collected premiums, it does not change the profitability of providing that coverage. Given continued profitability, insurers can be expected to continue to sell full coverage, regardless of the fact that the benefits they pay will duplicate benefits received under Medicare.

The Legislature's basic objective of reducing the cost of insurance through coordinating coverage may be more effectively achieved by recognizing

that the Insurance Bureau has the responsibility for enforcement of § 3109a's requirement to offer coordinated coverage. Requiring insurance companies to pay out duplicative benefits simply because duplicative premiums have been collected will not reduce the cost of insurance for the insured.

I suspect that any failure to coordinate Medicare coverage in the past may have been due to either the misconstruction of § 3109a as not reaching Medicare or, more likely, the failure of insurance agents to inquire as to other general health coverage that policyholders may have and to offer and explain coordinated coverage. I doubt that there are many policyholders who would not accept coordination if offered. Few people want redundant medical expense coverage or, to put it differently, are willing to pay for it. No one, despite what the opinion of the Court states, needs duplicative reimbursement of medical expenses.

The opinion of the Court in effect decides that when such failure to inquire as to other insurance coverage occurs, there will be duplicative recoveries. I would not require such duplicative payment of benefits and would look to the Insurance Bureau or to the Legislature if more is needed to enforce the act's requirement that agents of no-fault insurers actually offer and explain at the point of sale, rather than merely have available, coordinated policies with reduced premiums to reflect an insured's Medicare coverage.

### D

The construction of § 3109a which I believe correct is in accord with that of the Insurance Bureau, the agency charged with administering the act. Between the enactment of § 3109a and its effective date, the Commissioner of Insurance is-

sued Bulletin AD 74-2, providing guidelines to be followed in implementing the new law:

"Attached are guidelines to be followed when filing your company's coordination of benefits program.

\* \* \*

"Basically, the act [1974 PA 72] requires that automobile insurers must offer excess no-fault benefits to allow individuals who have health coverage which duplicates coverage under no-fault to eliminate the duplication.

\* \* \*

"The act applies to commercial and personal automobile insurance, but to the extent commercial rates have already been reduced to take account of workmen's compensation benefits or other statutorily required benefits, no further reductions would be required. \* \* \* *Note that coordination with statutory programs is defined by statute. For your information Medicare is a primary health program.*" (Emphasis changed.)[12]

Two inferences may be drawn from Bulletin AD 74-2. The first is that Medicare, like workers' compensation, is considered by the agency to be a statutory program whose coordination is defined by statute, *i.e.,* § 3109(1). The second is that since Medicare benefits are necessarily primary, deductions and exclusions, with appropriately reduced premiums, must be offered by the no-fault insurer under § 3109a.

This is the construction of the two sections that I would adopt. I agree with the Commissioner of Insurance that § 3109a does not provide authority to ignore the character of Medicare as a statutorily required benefit.

Insurers who fail to offer reduced premium rates based on "other accident and health coverage"

_____

[12] Insurance Department Bulletin AD 74-2 (issued as ED-1), April 15, 1974.

which also falls within the mandatory setoff provisions of § 3109(1) are subject to compliance proceedings by the Commissioner of Insurance.

## E

The distinction drawn by the Court between "benefits" and "coverage" is not sound. All insurance is "coverage" against a particular contingency. If that contingency occurs, the insurer is obligated to pay "benefits". Section 3109(1) requires the coordination of "benefits" paid to motor vehicle accident victims after an accident occurs. Section 3109a speaks of "coverages" offered and premiums paid before the event. It is the subject of the two provisions that dictated the Legislature's choice of words; that choice does not evidence a legislative intent to remove benefits paid pursuant to governmental health and accident coverage from the mandatory setoff applicable to all other kinds of benefits provided under state or federal law.

Further, the Court's construction establishes a distinction which I believe will prove untenable. By finding that § 3109a and § 3109(1) are mutually exclusive, the Court requires a determination whether any particular government benefit is to be considered "coverage". If the benefit results from "coverage", no setoff under § 3109(1) is required; if it does not, setoff is required.

What is "coverage"? Could not workers' compensation, for example, be considered insurance coverage for work-related injuries? Yet, in *Mathis, supra,* we held that workers' compensation must be set off under § 3109(1). The Court departs from the intelligible governmental/non-governmental distinction established by § 3109(1) and previously maintained by this Court in favor of a distinction

whose meaning is uncertain and for which the act provides little guidance.

## II

Justice RYAN states that Part B Medicare benefits (covering medical expenses) should be treated differently under § 3109(1) than Part A Medicare benefits (covering hospital expenses). In contrast with Part A, under which all qualified persons receive benefits, participation in Part B is voluntary, with half the cost met by premiums paid by the voluntary participants and the other half by governmental appropriations. Justice RYAN argues, therefore, that Part B has a hybrid character: so much of Part B benefits as are supported by premiums have the character of private insurance benefits, not requiring setoff under § 3109(1); and so much of Part B benefits as are supported by government appropriations have the character of "[b]enefits provided or required to be provided under the laws of * * * the federal government", requiring setoff under § 3109(1).

While such a distinction might make § 3109(1) a better statute, it would also make it a different statute. We must take the statute as it is. Part B Medicare benefits come within the literal terms of § 3109(1) as benefits provided under federal law. Setoff is required absent a showing of a legislative purpose justifying judicial departure from this literal meaning. Such a showing has not been made here.

My colleague's construction would limit the governmental benefits available for setoff, thereby increasing the costs of no-fault insurance. Absent a persuasive showing that such was the legislative purpose, I would enforce the literal language and primary purpose of § 3109(1), cost reduction.

The legislative history does not show a legislative purpose to distinguish governmental benefits according to whether participation is voluntary or involuntary. Without such a showing, it is beyond our authority to so differentiate governmental benefits.

As set forth in *O'Donnell, supra,* the distinction in § 3109(1) between benefits provided under law and other benefits was the result of a legislative compromise. The Legislature wished to reduce the cost of no-fault insurance by requiring setoff of benefits received from collateral sources while still allowing persons needing income protection in excess of no-fault maximums to obtain supplemental benefits. This legislative history would support excepting certain government benefits from the setoff requirement only if those benefits were supplemental to no-fault benefits and were designed to provide additional income protection where a no-fault benefit ceiling would leave some persons underinsured.

Part B Medicare benefits provide medical benefits, not income protection. Further, no-fault medical benefits, in contrast with no-fault income protection benefits, are not subject to any benefit ceiling, and thus cannot be said to come within the legislative purpose of allowing private supplementation. Finally, Part B Medicare benefits reimburse the same medical expenses as are reimbursed by no-fault benefits, and are therefore in fact duplicative rather than supplemental.

## III

The insured's argument that § 3109(1) is unconstitutional as applied to Medicare benefits assumes that if such benefits are within that section they cannot be within § 3109a. Medicare recipients, who

have paid premiums for such coverage as well as for no-fault coverage, would bear the entire cost of the coordination of Medicare benefits with no-fault benefits in the form of a setoff but would receive only a portion of the corresponding benefit in the form of the savings to the no-fault insurance purchasing public at large. Other health and accident insureds would receive the full benefit of coordination through no-fault premium reductions based on deductibles reasonably related to their health and accident coverage.

Medicare insureds as well as other health and accident insureds must, however, be offered premium rates reflecting deductibles and exclusions related to Medicare coverage. Since Medicare insureds derive the same benefit from coordination as do all other health and accident insureds, there is no differential treatment amounting to a denial of equal protection.[13]

---

[13] In *Neumann v Transit Casualty Co,* 96 Mich App 472; 292 NW2d 555 (1980), the Court of Appeals held that the distinction in § 3109(1) between voluntarily purchased private insurance benefits and voluntarily purchased governmental insurance benefits was not rationally related to a legitimate governmental purpose, and therefore violated equal protection. While LeBlanc has not made this argument here, the issue should be addressed.

I disagree with the Court of Appeals conclusion in *Neumann.* The Legislature could rationally have decided that most governmental benefit programs are financed, in whole or in part, by public monies and are designed, in whole or in part, to achieve social purposes beyond simply providing a service (here insurance) for a fee. Distinguishing such governmental programs from private programs does not violate the "rational relation" analysis under the Equal Protection Clause. Under that least strict of equal protection standards, the Legislature need not fine tune its distinction to precisely except that portion of governmental benefit programs not to any degree funded with public monies or infused with public policy, if indeed any such programs exist.

Further, the Legislature could rationally distinguish between governmental agencies as payors and private insurance companies as payors. Not only is the solvency of the governmental payor a virtual certainty, but it may be presumed that the governmental payor will not be influenced by any profit-maintenance considerations in determining whether a participant is entitled to a particular benefit or amount of benefits.

I would affirm the decision of the Court of Appeals.

KAVANAGH, J., concurred with LEVIN, J.

RYAN, J. *(dissenting)*. I am in accord with my Brother LEVIN's study of the relationship between §§ 3109(1) and 3109a of our no-fault insurance act[1] and the conclusions that follow therefrom. I do not agree, however, with his monolithic treatment of Medicare; a treatment that fails to discriminate between the two programs Medicare comprises and, in my view, precludes a correct result in this case.

Medicare is a 15-year-old federal program subsumed within the structure of the social security system[2] and designed to finance certain medical expenses incurred by persons 65 years old and over. It consists of two discrete parts, Parts A and B.[3] As will be demonstrated, the disparate character of the parts, especially with respect to the manner in which they are capitalized, compels disparate legal consequences for each.

Part A[4] is entitled "Hospital Insurance Benefits for Aged and Disabled". It "is incorporated within the existing social security patterns. *Contributions are universal and mandatory.* * * * [E]ligibility [is] a right only for persons 65 and over who meet the conditions required for cash social security benefits".[5]

---

[1] MCL 500.3109 subd (1); MSA 24.13109 subd (1) and MCL 500.3109a; MSA 24.13109(1).

[2] 42 USC 401 *et seq.*

[3] "[T]he Medicare program is a dual structure comprising two separate insurance programs, distinct as to benefits, coverage, financing, and administration". H. Somers & A. Somers, Medicare and the Hospitals—Issues and Prospects (Washington DC: The Brookings Institution, 1967), p 19.

[4] 42 USC 1395c-1395i-2.

[5] H. Somers & A. Somers, Medicare and the Hospitals—Issues and

As the Washington Supreme Court observed in *Witherspoon v St Paul Fire & Marine Ins Co,* 86 Wash 2d 641, 645; 548 P2d 302, 305 (1976):

"Part A benefits (hospitalization) are not obtained by beneficiaries who voluntarily enter into a contract with the federal government. Part A benefits are paid as a result of *mandatory* payroll or self-employment taxes to those persons 65 and over who meet the conditions for Social Security benefits." (Emphasis added.)

Accordingly, it has been declared that Part A[6] benefits "are in the nature of disbursements made in furtherance of the social welfare objectives of the Federal government". Rev Rul 70-341, 1970-2 Cum Bull 31. This amounts to " 'social welfare legislation' ". *Imvris v Michigan Millers Mutual Ins Co,* 39 Mich App 406, 410; 198 NW2d 36 (1972). As that term suggests, Part A Medicare comprehends forced participation.

In stark contrast to Part A stands Part B,[7] which is entitled, "Supplementary Medical Insurance Benefits for Aged and Disabled". The pertinent statute states:

---

Prospects (1967), pp 19-20.

[6] Part A "provides basic protection against the costs of hospital and related posthospital services". 42 USC 1395c. This includes:

"A semiprivate room (2-4 beds) and all meals, including special diets;

"Routine nursing services;

"Special care units, such as intensive care unit and coronary care unit;

"Drugs furnished by the hospital while you are an inpatient;

"Operating and recovery rooms;

"Rehabilitation services such as physical therapy, occupational therapy, and speech pathology;

"X-ray and other radiology services for diagnosis or treatment;

"Lab tests included in your hospital bill." United States Dep't of Health, Education & Welfare, Pub No. SSA 78-10039.

[7] 42 USC 1395j-1395w.

"There is hereby established a *voluntary insurance program to provide medical insurance benefits* in accordance with the provisions of this part for aged and disabled individuals who elect to enroll under such program, *to be financed from premium payments by enrollees* together with contributions from funds appropriated by the Federal Government." 42 USC 1395j (emphasis added).[8]

And, as further explained,

"Part B, the supplementary medical benefits plan, is voluntary and open to any person aged 65 or over (except nonresident aliens) irrespective of social security status. Premiums are paid on a current basis. Benefit payments under the two plans are made by different administrative 'intermediaries' (called 'carriers' under Part B)." H. Somers & A. Somers, Medicare and the Hospitals—Issues and Prospects (Washington, DC: The Brookings Institution, 1967), pp 19-20.

It is apparent, in light of the foregoing, that Part B Medicare in important respects has attributes associated with private medical insurance. Participation is entirely voluntary and benefits are generated, in part, by premiums paid by the participants. I agree with the observation made by the Supreme Court of Washington that "Part B [has] a 'contract' aspect not present in Part A". *Witherspoon v St Paul Fire & Marine Ins Co,* 86 Wash 2d 646; 548 P2d 305. See *Black v American Bankers Ins Co,* 478 SW2d 434, 439 (Tex, 1972) ("The Medicare insurance program is similar in many respects to hospital insurance programs which are

---

[8] "[Part B] covers doctors' medical and surgical services, outpatient hospital services, outpatient physical therapy and speech pathology services, durable medical equipment, services from independent laboratories, ambulance services, home health care, and a number of other health services and supplies." United States Dep't of Health, Education & Welfare, Pub No. SSA 76-10037.

sold by many private insurance companies"); *Neumann v Transit Casualty Co,* 96 Mich App 472; 292 NW2d 555 (1980).

In sum, the salient attributes of "social welfare" insurance—mandatory participation in and funding of a government administered program designed to mitigate the economic disparities of a society—are present in Part A, whereas attributes of private insurance contracts are present in Part B, imparting to it a preponderately private character. The question now is whether this distinction is of any legal significance with respect to the application of §§ 3109(1) and 3109a of the no-fault act[9] to Medicare.

Section 3109(1) mandates set-off of all "[b]enefits provided or required to be provided under the laws of any state or the federal government". Justice LEVIN believes all Medicare benefits, Part A and Part B, must be set off. This, admittedly, is the result that ensues from a literal reading of the statute. It is well settled, however, that we are not confined to the literal meaning of statutory language in the face of a countervailing legislative intent.[10]

An aspect of that intent was discerned recently in *O'Donnell v State Farm Mutual Automobile Ins Co,* 404 Mich 524, 544; 273 NW2d 829 (1979):

---

[9] "Sec. 3109. (1) Benefits provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury." MCL 500.3109 subd (1); MSA 24.13109 subd (1).

"Sec. 3109a. An insurer providing personal protection insurance benefits shall offer, at appropriately reduced premium rates, deductibles and exclusions reasonably related to other health and accident coverage on the insured." MCL 500.3109a; MSA 24.13109(1).

[10] "[T]he proper construction of any statute is for the court. The purpose of the court in interpreting a statute is to give effect to the legislative intent. If there is a conflict, the spirit and purpose of the statute should prevail over its strict letter." *Aikens v Dep't of Conservation,* 387 Mich 495, 499; 198 NW2d 304 (1972). (Citations omitted.)

"The history of § 3109(1) indicates that the Legislature's intent was to *require* a set-off of those government benefits that duplicated the no-fault benefits payable because of the accident and thereby reduce or contain the cost of basic insurance." *Id.* (emphasis added).

And, as Justice LEVIN correctly demonstrates, the specific mechanism for the reduction of the cost of basic insurance is § 3109a, which *requires* the no-fault insurer to charge "appropriately reduced premium rates". However, although § 3109a serves to coordinate no-fault insurance with "other health and accident coverage on the insured", whether that coverage is governmental or nongovernmental, with a view to encouraging elimination of overlapping coverage, it does not proscribe overlap between no-fault and private medical insurance. As we found in *O'Donnell,* § 3109a permits "persons with needs exceeding the benefits provided by no-fault insurance to obtain the extra coverage they [require]". 404 Mich 550. On the other hand, § 3109(1) does proscribe overlap between no-fault and "government benefits". The question arises, to what end is the disparate treatment of "government benefits"?

It is apparent that our Legislature intended to eliminate overlapping benefits to the extent the insured must *involuntarily* participate in the programs creating the overlap. Thus, in the case of no-fault insurance and social security, both *mandatory* government programs, the insured has no choice but to be the object of overlapping coverage. And since the insured must pay, in one form or another, for the duplicative coverage, he or she, by the confluence of unrelated government programs, is *forced* to pay for more insurance than circumstances require. This, in my view, is quite clearly the bane § 3109(1) is intended to redress. One

should be allowed, *but not required,* to obtain duplicative coverage.

Part B Medicare benefits, to the extent they are the product of *voluntary* contributions, do not entail the harm § 3109(1) was enacted to avoid, and, therefore, should not be subject to the mandatory set-off of that provision.[11]

It is important to note, however, that Part B benefits derive from both voluntary and involuntary contributions.

> "[T]he supplementary governmental insurance benefit program [Part B] is funded by both premium payments by the enrollees and funds appropriated by the Federal government. 42 USC 1395j. The amount of the premiums paid by the enrollees is calculated to pay for one half of the costs of the program. 42 USC 1395r(b)(2)." *Neumann v Transit Casualty Co,* 96 Mich App 472, 479.

It follows that only one-half of the benefits provided under Part B, the half attributable to the voluntary monthly premiums of the subscribers,[12] can justifiably escape the purview of the mandatory set-off of § 3109(1). Any less set-off would result in a windfall for those subscribers.

This result is in accord with that reached by our Court of Appeals in *Neumann v Transit Casualty Co,* 96 Mich App 472; 292 NW2d 555 (1980). The result here, however, is the product of statutory construction, not, as in *Neumann,* the mandate of the Equal Protection Clause.[13] Accordingly, I do not reach the constitutional question answered by the *Neumann* panel.

Because it is unclear under which part and to

---

[11] As the foregoing implies, I agree with Justice LEVIN that Part A benefits must be set off from no-fault benefits.

[12] At this time, the monthly premium is $9.60.

[13] Nevertheless, it is noteworthy that the predicate for the equal protection analysis was the *Neumann* panel's distinction between "purchased governmental benefits" and "*ex gratia* governmental benefits", which was found to be "significant". 96 Mich App 478. The

what extent the instant Medicare benefits were paid,[14] I would remand to the trial court for a determination of that question and an entry of judgment consistent with this opinion.

---

former, Part B benefits, were at issue in that case. The *Neumann* panel, furthermore, was correct in concluding that that distinction followed from the rationale utilized in *O'Donnell v State Farm Mutual Automobile Ins Co,* 404 Mich 524; 273 NW2d 829 (1979).

[14] See Chief Justice COLEMAN's fn 8.