**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**FILED MAY 3, 2005**

ARTHUR T. JARRAD,

    Plaintiff-Appellee,

v

    No. 126176

INTEGON NATIONAL INSURANCE
COMPANY,

    Defendant-Appellant.

_____

**BEFORE THE ENTIRE BENCH**

**CORRIGAN, J.**

In this no-fault coordination-of-benefits case, the trial court and the Court of Appeals ruled that an employer's self-funded long-term disability plan may not be coordinated with no-fault wage loss benefits. We hold that a self-funded long-term disability plan constitutes "other health and accident coverage" that is subject to coordination under MCL 500.3109a. We therefore reverse the judgment of the Court of Appeals, and remand the matter to the trial court for entry of an order granting summary disposition for defendant.

Plaintiff sustained injuries in an automobile accident. At the time of the accident, he was employed by the Michigan Department of Corrections. Under a collective bargaining agreement, the state provided a long-term disability (LTD) plan that covered plaintiff. An insurance company administered the plan and processed benefit payments, but the plan was self-funded by deductions from employees' paychecks and employer contributions.

Following the accident, plaintiff began receiving monthly payments of $2,220.04 under the LTD plan. Under the coordination-of-benefits clause in plaintiff's no-fault policy, defendant, plaintiff's no-fault insurer, deducted the LTD benefits from its no-fault wage loss payments, for a net amount of $1,467.76 a month for three years following the accident.[1] Plaintiff filed this action to challenge the coordination of benefits. The parties filed cross-motions for summary disposition. The trial court granted summary disposition for plaintiff.

The Court of Appeals affirmed in a two-to-one decision.[2] The majority noted that MCL 500.3109a permits coordination of no-fault benefits with "other health and

---

[1] Under MCL 500.3107(1)(b), no-fault wage loss benefits are payable for up to three years after the accident.

[2] Unpublished opinion per curiam, issued January 27, 2004 (Docket No. 245068).

2

accident coverage . . . ." The majority explained that in *LeBlanc v State Farm Mut Automobile Ins Co*, 410 Mich 173, 204; 301 NW2d 775 (1981), this Court had construed the word "coverage" as "a word of precise meaning in the insurance industry, [that] refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance." While this definition has expanded under Court of Appeals case law to include medical benefits received from health plans *typically* provided by insurers, the majority opined that no such expansion of the term "coverage" has occurred regarding work-loss benefit plans.

Moreover, the majority construed *Spencer v Hartford Accident & Indemnity Co*, 179 Mich App 389; 445 NW2d 520 (1989), to preclude coordination where an employee receives "wage loss benefits from his employer through a formal wage continuation plan pursuant to a collective bargaining agreement." The majority distinguished *Rettig v Hastings Mut Ins Co*, 196 Mich App 329; 492 NW2d 526 (1992), because in that case LTD benefits were provided under an insurance policy, rather than directly by the employer under a collective bargaining agreement.

Judge Zahra, the dissenting Court of Appeals judge in this case, opined that the self-funded LTD plan constituted "other health and accident coverage" that is subject to coordination under MCL 500.3109a. Unlike *Spencer*, where

the employer paid wage continuation benefits directly to the employee, the instant case involves an insurance-type benefit paid by a third party from accumulated payroll contributions. The dissent would have followed *Rettig,* in which the Court of Appeals held that LTD benefits "constitute protection *typically provided* by health insurance plans, which include payments for medical expenses resulting from an accident as well as wage-loss replacement benefits." *Rettig*, *supra* at 333 (emphasis added).

Judge Zahra also opined that the self-funded nature of the plan was not dispositive, because in drafting § 3109a, the Legislature used the broad term "coverage" rather than "insurance." Moreover, case law reflects that the phrase "other health and accident coverage" includes coverage *typically* provided by an insurance company, regardless of whether it is actually provided by an insurance company in a particular case. For example, Michigan courts have held that "other health and accident coverage" includes: military medical benefits paid by the federal government, *Tatum v Gov't Employees Ins Co*, 431 Mich 663; 431 NW2d 391 (1988); Medicare benefits, *LeBlanc*, *supra*; medical benefits provided under a union plan, *Lewis v Transamerica Ins Corp of America*, 160 Mich App 413; 408 NW2d 458 (1987); services offered by health maintenance organizations, *United States*

4

*Fidelity & Guaranty Co v Group Health Plan of Southeast Michigan*, 131 Mich App 268; 345 NW2d 683 (1983); and medical and disability benefits provided by the Army and Veterans Administration, *Bagley v State Farm Mut Automobile Ins Co*, 101 Mich App 733; 300 NW2d 322 (1980).

Defendant applied for leave to appeal in this Court. We held oral argument on whether to grant the application or take other peremptory action permitted by MCR 7.302(G)(1).[3]

## II. STANDARD OF REVIEW

We review de novo the decision whether to grant summary disposition. *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). Moreover, the meaning of the phrase "other health and accident coverage" in MCL 500.3109a is a question of law that is also reviewed de novo. *Jenkins v Patel*, 471 Mich 158, 162; 684 NW2d 346 (2004).

## III. DISCUSSION

### A. Legal Background

MCL 500.3109a states:

> An insurer providing personal protection insurance benefits shall offer, at appropriately reduced premium rates, deductibles and exclusions reasonably related to other health and accident coverage on the insured. The deductibles and exclusions required to be offered by this section shall be subject to prior approval by the commissioner and shall apply only to benefits payable to the person named in the policy, the

---

[3] 471 Mich 914 (2004).

5

spouse of the insured and any relative of either domiciled in the same household.

In *Nyquist v Aetna Ins Co*, 84 Mich App 589; 269 NW2d 687 (1978), the plaintiffs argued that Blue Cross-Blue Shield benefits were not insurance[4] and therefore could not be coordinated with no-fault benefits.  The Court of Appeals concluded that coordination was permitted, noting "that § 3109a uses the word 'coverage' rather than 'insurance'; the use of the broader term militates against plaintiffs' restrictive reading of the section at issue." *Nyquist*, *supra* at 592.  Moreover, the plaintiffs' restrictive reading would subvert the statutory purpose of eliminating duplicative coverage.

An employee's use of accumulated sick leave, however, is not subject to coordination.  In *Orr v DAIIE*, 90 Mich App 687; 282 NW2d 177 (1979), the Court of Appeals noted that the word "coverage" means protection by an insurance policy, and that the Legislature thus intended to limit coordination to health and accident *insurance* coverage. Sick leave does not fall within this definition.  The plaintiff's sick bank could fluctuate depending on usage. Thus, "[a]ny rate reduction granted based upon this fluctuating benefit could not be actuarially sound. However, a rate based upon another policy of insurance with

---

[4] See *Michigan Hosp Service v Sharpe*, 339 Mich 357; 63 NW2d 638 (1954).

fixed limits of liability would enable the insurance company to offer appropriately reduced premium rates." *Id.* at 690-691.

In *LeBlanc*, *supra*, this Court held that Medicare benefits were "health and accident coverage" subject to coordination. This Court stated that because the Legislature did not modify the statutory phrase "other health and accident coverage" with the word "private," the Legislature "intended to give unrestrained application of § 3109a to health and accident coverage *from whatever source*." *LeBlanc, supra* at 202 (emphasis added). "Thus, both private and non-private plans were within the scope of the bill." *Id.* at 203.

The *LeBlanc* Court also stated: "'Coverage,' a word of precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance." *Id.* at 204. This Court concluded that Medicare constituted "other health and accident coverage" because the Court perceived "no just reason to differentiate Medicare from other, more traditional, forms of health and accident coverage which irrefutably are within the scope of § 3109a. Just like any so-called private insurer, Medicare compensates providers of medical and hospital services on behalf of participants who require health care." *Id.* at 205. This Court found it

"inconsequential" that, in other contexts, "Medicare has been deemed not to be insurance in the usual sense of the term: the same has been said of Blue Cross and Blue Shield plans which, according to *Nyquist*, fall within § 3109a."[5] *Id.*

In *United States Fidelity*, *supra*, the Court of Appeals held that services offered by a health maintenance organization (HMO) were health and accident coverage for purposes of § 3109a. The Court of Appeals acknowledged that HMOs "have a unique character. Rather than providing health insurance and paying for the bills after the insured has been treated by a doctor, an HMO is a prepaid plan where the participant pays before hand for the services themselves. . . . *Under traditional definitions, a health maintenance organization does not sell insurance.*" *United States Fidelity, supra* at 272 (emphasis added).

---

[5] Although the *LeBlanc* Court concluded that Medicare was "other health and accident coverage," no coordination was allowed in that case because the insured did not elect a coordinated policy. This Court's holding avoided the *mandatory* coordination provision in MCL 500.3109(1) ("Benefits provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury.") by ruling that the *permissive* coordination provision in MCL 500.3109a controlled instead. This aspect of the analysis in *LeBlanc* is not implicated here because it is undisputed that plaintiff chose a coordinated policy. We also note that Congress has subsequently amended federal law to make Medicare benefits secondary to no-fault insurance. See 42 USC 1395y(b).

But MCL 500.3109a; MSA 24.13109(1) does not refer to "insurance" but to "health and accident coverage". Not only have medical and disability benefits from the Army and the Veterans Administration been included within this statute, *Bagley v State Farm Mut Automobile Ins Co*, 101 Mich App 733; 300 NW2d 322 (1980), but Medicare payments have also been included. [*LeBlanc, supra.*] The term used, "coverage", is a broad term. [*Nyquist, supra.*] Accordingly, we hold that the services offered by defendant are "health and accident coverage" as defined by MCL 500.3109a; MSA 24.13109(1). [*Id.* at 272-273.]

In *Lewis, supra,* the Court of Appeals held that a union plan that pays medical expenses constitutes "other health and accident coverage" under § 3109a. The Court of Appeals noted that the intent of this provision "was to reduce insurance costs by obviating the potential for double recovery." *Lewis, supra* at 418. "To accomplish this end, the Legislature purposely used the broad term 'coverage' rather than 'insurance' in describing health and accident benefits available to the insured independent of the no-fault contract." *Id.*

In *Tatum, supra,* the Air Force paid the insured's medical expenses pursuant to a federal statute. This Court held that those benefits constituted "other health and accident coverage" under § 3109a. Reviewing the holdings in *LeBlanc* and *Nyquist,* the *Tatum* Court reasoned:

Military medical coverage is similar to both Blue Cross-Blue Shield and Medicare in the sense that, in various forms, each is comprehensive coverage of eligible individuals for their medical and hospitalization costs. Further, Blue Cross-Blue Shield coverage, when provided through

9

> one's employer, can parallel that which is
> provided to active military personnel by the
> federal government under [the federal statute].
> We can perceive no rational basis for concluding
> that military medical benefits, which essentially
> serve the same purpose as Blue Cross-Blue Shield
> and Medicare benefits, are not "health and
> accident coverage" within the meaning of § 3109a.
> [*Tatum, supra* at 670.]

In *Spencer*, *supra*, the Court of Appeals held that wage continuation benefits paid directly by an employer pursuant to a collective bargaining agreement did not constitute "health and accident coverage" under § 3109a. The Court of Appeals opined that the Uniform Motor Vehicle Accident Reparations Act (UMVARA), a model act on which our no-fault law is based, contained a broader coordination-of-benefits provision, and that the model provision would have included wage continuation benefits pursuant to a union agreement. But because our no-fault law was drafted more narrowly, the Court of Appeals believed that the Legislature did not intend to allow coordination in this situation.

In *Rettig*, *supra*, the Court of Appeals held that LTD benefits paid by an insurance company could be coordinated under § 3109a. The panel stated that the phrase "other health and accident coverage" "has generally been limited to benefits typically associated with health insurance plans." *Rettig, supra* at 333. The LTD benefits at issue constituted such "coverage" "because they constitute protection typically provided by health insurance plans,

10

which include payments for medical expenses resulting from an accident as well as wage-loss replacement benefits. *LeBlanc*, *supra*, p 204." *Rettig*, *supra* at 333. The panel distinguished *Spencer* on the ground that the LTD benefits in *Rettig* were paid by an insurance company under an insurance policy, rather than a collective bargaining agreement.

## B. Analysis

While the case law is rather muddled regarding the precise meaning of the phrase "other health and accident coverage," we agree with the Court of Appeals dissent in this case that the term does not require that a risk *actually* be insured under a commercial insurance policy. As noted in *Nyquist*, in drafting § 3109a, the Legislature used the broader term "coverage" rather than "insurance." The *LeBlanc* Court stated that the term "coverage" refers to protection afforded by an insurance policy or the sum of risks assumed by an insurance policy. The Court concluded that Medicare is sufficiently similar to an insurance policy to constitute "health and accident coverage." Similarly, military benefits and HMO benefits have been treated as sufficiently akin to insurance to constitute health and accident coverage. *Tatum, supra; United States Fidelity, supra.*

11

Therefore, as the Court of Appeals dissent observed, the central question under our case law is *not* whether an insurance company *actually* provided the coverage, but rather whether the coverage is *typically* provided by an insurance company. That approach is consistent with the statutory text, which refers merely to "coverage" and contains no language limiting its application to commercial insurance policies.

Here, there is no question that LTD benefits are *typically* provided by insurance companies. Indeed, the Court of Appeals held in *Rettig* that LTD benefits fall within the statutory term. The fact that the coverage here was funded by employer and payroll contributions, rather than by a separate insurance company, does not alter the fact that this type of coverage is typically provided by insurance companies. We thus perceive no basis to preclude coordination with a self-funded plan.

Moreover, the view that a self-funded long-term disability plan is not "other health and accident coverage" disregards case law allowing coordination with self-funded medical plans under § 3109a. See, e.g., *Lewis*, *supra*; *Michigan Millers Mut Ins Co v West Michigan Health Care Network*, 174 Mich App 196; 435 NW2d 423 (1988); *Auto-Owners Ins Co v Lacks Industries,* 156 Mich App 837; 402 NW2d 102 (1987). We discern no principled reason why self-funded

long-term disability plans should be treated differently from self-funded medical plans, in light of the holding in *Rettig* that LTD plans are "other health and accident coverage."

Additionally, the courts in *Rettig, Lewis, Michigan Millers Mut,* and *Lacks Industries* manifested an understanding that causing not only third-party funded LTD and medical plans, but also self-funded ones, to qualify as "other health and accident coverage" is consistent with the Legislature's overarching commitment in the no-fault act, and its later amendments, to facilitating reasonable economies in the payments of benefits, thus causing the costs of this mandatory auto insurance to be more affordable. See *State Farm Fire & Cas Co v Old Republic Ins Co,* 466 Mich 142, 151; 644 NW2d 715 (2002); *Cruz v State Farm Mut Automobile Ins Co,* 466 Mich 588, 597 n 13; 648 NW2d 591 (2002); *O'Donnell v State Farm Mut Automobile Ins Co,* 404 Mich 524; 273 NW2d 829 (1979).

Also, the Court of Appeals has treated self-insurance as a form of insurance in other contexts. For example, in *Allstate Ins Co v Elassal*, 203 Mich App 548; 512 NW2d 856 (1994), the Court of Appeals recognized that self-insurance, as certified by the Secretary of State, is the functional equivalent of a commercial no-fault insurance policy. While the Court relied in part on provisions of

the no-fault act, MCL 500.3101 *et seq.*, and the financial responsibility act, MCL 257.501 *et seq.*, it also discussed the "common understanding of insurance":

> The term insurance can be defined . . . as a contract between two parties for indemnification. Black's Law Dictionary (4th ed), p 943. However, definitions of insurance also include: "coverage by contract whereby one party undertakes to indemnify or guarantee another against loss by a specified contingency or peril," *Webster's Seventh New Collegiate Dictionary* (1970), p 439 (definition 2b), see also *Random House Webster's College Dictionary* (1991), p 699 (definition 2); "the sum for which something is insured," *Webster's Seventh New Collegiate Dictionary*, *supra*, p 439 (definition 2c); and "any means of guaranteeing against loss or harm," *Random House Webster's*, *supra*, p 699 (definition 6). In this case, Enterprise was certified as self-insured, meaning, for purposes of the no-fault and financial responsibility acts, that it had indemnified itself to satisfy judgments against it. [*Elassal*, *supra* at 555.]

We do not suggest that the holding in *Elassal* is directly relevant, because we are concerned here not with a self-insured *no-fault* plan, but rather with a self-funded LTD plan that a no-fault insurer seeks to coordinate with its no-fault policy. We simply observe that the *reasoning* in *Elassal* suggests that *even if* § 3109a referred to "insurance" and not (as it does) to "coverage," a strong argument would still exist that a self-funded LTD plan constitutes "insurance" under the common understanding of that term.

Further, we reject the Court of Appeals majority's view—derived from the holding in *Spencer*—that the existence

14

of a collective bargaining agreement somehow negates the existence of "other health and accident coverage." The text of § 3109a refers to health and accident coverage—the central question is whether other coverage *exists*, not *how* it came to exist. It is simply not relevant under the statutory text whether the coverage arose from a collective bargaining agreement.

Next, we address the *Spencer* Court's reliance on language in the UMVARA, the model act on which our no-fault act was based. The *Spencer* Court observed that the UMVARA contained the following provision:

> "(b) [B]asic reparation insurers may offer the following additional exclusions . . .
>
> * * *
>
> "(2) [Exclusions], in calculation of net loss, of any of those amounts and kinds of loss otherwise compensated by benefits or advantages a person receives or is unconditionally entitled to receive from any other specified source, if the other source has been approved specifically or as to type of source by the [commissioner] of insurance by rule or order adopted upon a determination by the [commissioner] (i) that the other source or type of source is reliable and that approval of it is consonant with the purposes of this Act, and (ii) if the other source is a contract of insurance, that it provides benefits for accidental injuries generally and in amounts as [sic] least as great for other injuries as for injuries resulting from motor vehicle accidents." [*Spencer*, *supra* at 399, quoting 14 ULA Civil Procedural and Remedial Laws, UMVARA, § 14(b)(2), pp 82-83.]

The *Spencer* Court also extracted an official comment to the model provision: "'The cost reductions may be

15

significant, however, in the case of an insurer offering to sell basic reparation policies to the employees of a large employer, who have defined, generous wage-continuation and accident and health benefits under a common employer-furnished or trade union plan.'" *Spencer*, *supra* at 399-400, quoting official comments to § 14(b)(2), *supra*, p 85.

The *Spencer* Court then reasoned that "it is clear from the comments that, under the UMVARA, wage continuation benefits pursuant to a union agreement were intended to be coordinated with no-fault benefits otherwise payable." *Spencer, supra* at 400. The Court then asserted that because the Legislature did not adopt "the broader language of the uniform act," it "did not intend for no-fault benefits to be coordinated with a broad array of other benefits which may perhaps be equally duplicative." *Id.*

We emphasize that a court's fundamental interpretive obligation is to discern the legislative intent that may reasonably be inferred from the words expressed in the statute. *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). Where the Legislature has unambiguously conveyed its intent in a statute, judicial construction is not permitted. Because the proper role of the judiciary is to interpret, not write, the law, courts lack authority to venture beyond the unambiguous statutory text. *Id.*

The *Spencer* Court relied on the proposition that where the Legislature does not adopt a model provision, it presumably rejected the proposed language. *Spencer*, *supra* at 399, citing *Michigan Mut Ins Co v Carson City Texaco, Inc*, 421 Mich 144; 365 NW2d 89 (1984). The *Spencer* Court failed, however, to adequately explain why this principle supported its holding.

The Legislature's deviation from the language in a model act does not grant a court license to simply assert, without any reasoning, that (1) the statute is narrower than the model provision, and (2) the statute must therefore produce a different outcome than the model provision would generate. Such conclusions do not follow ineluctably from the Legislature's rejection of particular language in a model provision.

It is, of course, possible that the Legislature rejected a model provision because it did not wish to enact the provision into law. Other inferences may arise, however. For example, our Legislature might simply have found a better way than the drafters of the model provision to express the same proposition. Perhaps our Legislature used a synonym or more succinct language to state whatever the drafters of the model provision had attempted to say. Or the Legislature might have concluded that another statutory provision in Michigan rendered the model

17

provision unnecessary. Thus, the mere fact that a statute is written *differently* from a model act does not always compel the conclusion that our statute is written *more narrowly*.

But even if a statute *is* written more narrowly than a model provision, a court's analysis does not end there. Even a statute that is written narrowly could apply to the particular case before the court. A statutory provision that provides for coordination, but in *fewer* circumstances than a model provision, will still allow coordination in *some* circumstances. Otherwise, the statutory provision would never allow coordination and would be essentially nugatory. Courts must give effect to every word, phrase, and clause in a statute, and must avoid an interpretation that would render any part of the statute surplusage or nugatory. *Koontz*, *supra* at 312.

Thus, even if the *Spencer* Court had supported its assertion that § 3109a is written more narrowly than the model provision, the question would remain whether the statute allowed coordination *in the circumstances at issue in that case*. Merely asserting, as the Court did in *Spencer*, that a statute is narrow does not, by itself, resolve whether the statute applies to a given case.

A court may not simply announce that the text of a statute differs from the language in a model act (or, as in

*Spencer*, a *comment* to the model act) as an excuse to avoid the court's duty to interpret the statutory text *adopted by the Legislature*. The *Spencer* Court did not analyze the language of § 3109a. The Court failed to explain why the benefits at issue did not fall within the plain meaning of the term "other health and accident coverage." The Court also did not explain how the statutory phrase is not only narrower than the model language, but *too* narrow to allow coordination *in that case*.

Here, it is simply unnecessary to decide whether the model provision is broader than the statute. We conclude that § 3109a allows coordination in this case, regardless of whether it is broader or narrower than the model provision. As discussed, we agree with the Court of Appeals dissent that the statutory phrase, "other health and accident coverage," plainly includes defendant's self-funded long-term disability plan. We discern no textual basis to limit the phrase "other health and accident coverage" to commercial insurance policies. Section 3109a contains no such limitation, and we believe the phrase "other health and accident coverage" includes self-funded plans.

Therefore, regardless of how broadly the model provision might reach, the text of § 3109a plainly allows coordination of no-fault benefits with a self-funded long-

19

term disability plan.[6]  We overrule *Spencer* to the extent that it is inconsistent with this opinion.

## IV. CONCLUSION

We conclude that the phrase "other health and accident coverage" in § 3109a includes a self-funded long-term disability plan, and that defendant may therefore coordinate its no-fault wage loss payments with plaintiff's LTD benefits.  We thus reverse the judgment of the Court of Appeals and remand the matter to the trial court for entry of an order granting summary disposition for defendant.

> Maura D. Corrigan
> Clifford W. Taylor
> Elizabeth A. Weaver
> Robert P. Young, Jr.
> Stephen J. Markman

---

[6] Our dissenting colleague analyzes the model provision that the Legislature did not adopt.  We again emphasize that a court's fundamental interpretive obligation is to discern the legislative intent that may reasonably be inferred from the words expressed in the statute.  *Koontz*, *supra*, p 312.  Where the Legislature has unambiguously conveyed its intent in the statutory text, judicial construction is not permitted.  *Id*.  We have examined the statutory text and concluded that the phrase used by our Legislature, "other health and accident coverage," is sufficiently broad to include a self-funded LTD plan.  Because we are satisfied that the words adopted by our Legislature are sufficiently clear to resolve this question, we simply have no occasion to resort to the method of judicial construction utilized by the *Spencer* Court and advocated by the dissent in this case.

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

ARTHUR T. JARRAD,

　　Plaintiff-Appellee,

v                                                             No. 126176

INTEGON NATIONAL INSURANCE COMPANY,

　　Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

In this no-fault case, I would conclude that the long-term disability (LTD) plan covering plaintiff does not constitute "other health and accident coverage" subject to coordination under MCL 500.3109a.  I am not convinced that the dichotomy set forth by *Spencer v Hartford Accident & Indemnity Co*, 179 Mich App 389; 445 NW2d 520 (1989), and *Rettig v Hastings Mut Ins Co*, 196 Mich App 329; 492 NW2d 526 (1992), is inconsistent with the Legislature's intent.  Moreover, I would not decide this jurisprudentially significant issue without the benefit of full briefing and oral argument.  Accordingly, I must respectfully dissent.

### I. Factual Background

Plaintiff worked for the Michigan Department of Corrections.  Under his collective bargaining agreement, plaintiff was allowed to participate in the LTD plan.  The LTD plan was administered by a private insurance company;

however, the plan was self-funded through payroll deductions and employer contributions. While still employed by the Department of Corrections, plaintiff was injured in an automobile accident. Plaintiff began receiving benefits under the LTD plan, and defendant, plaintiff's no-fault insurer, coordinated the LTD benefits with the no-fault work-loss benefits. Defendant maintained that the setoff was permissible under MCL 500.3109a. Plaintiff filed this action to challenge the setoff, and the parties filed cross-motions for summary disposition. The trial court granted summary disposition in favor of plaintiff, and the Court of Appeals affirmed.

II. LEGAL BACKGROUND

A. MCL 500.3109a

MCL 500.3109a provides:

> An insurer providing personal protection insurance benefits shall offer, at appropriately reduced premium rates, deductibles and exclusions reasonably related to other health and accident coverage on the insured. The deductibles and exclusions required to be offered by this section shall be subject to prior approval by the commissioner and shall apply only to benefits payable to the person named in the policy, the spouse of the insured and any relative of either domiciled in the same household.

B. *Spencer v Hartford Accident & Indemnity Co*

In *Spencer*, *supra*, the plaintiff was injured during the course of his employment and was unable to return to work. After the accident, the plaintiff received worker's

2

compensation benefits. Additionally, under the terms of a collective bargaining agreement between the plaintiff's union and his employer, the plaintiff received the difference between his worker's compensation benefits and his base rate of pay. The defendant insurance company denied liability for no-fault work-loss benefits, claiming, among other things, that the wage continuation benefits were subject to setoff pursuant to MCL 500.3109a.

The *Spencer* panel noted that the "purpose of § 3109a is to reduce the cost of no-fault insurance by allowing insurers to offer policies that coordinate benefits with other similar coverages in return for charging a statutorily mandated reduced premium." *Spencer, supra* at 396. The Court of Appeals reasoned that § 3109a expressly limits setoff to health and accident coverage on the insured and, therefore, the issue was whether the additional wages the plaintiff received pursuant to a collective bargaining agreement constituted "other health and accident coverage" under § 3109a. The Court of Appeals held that the Legislature did not intend for § 3109a to apply to the type of benefits the plaintiff received.

After detailing this Court's decision in *LeBlanc v State Farm Mut Automobile Ins Co*, 410 Mich 173; 301 NW2d 775 (1981), as well as its own decision in *Orr v DAIIE*, 90 Mich App 687; 282 NW2d 177 (1979), the Court of Appeals

noted that the scope of coverages within the meaning of "other health and accident coverage" had been subsequently expanded. However, "the cases so doing have generally been limited to benefits corresponding to typical health insurance plans." *Spencer*, *supra* at 398. In light of these decisions, and the absence of a clear construction of the phrase "other health and accident coverage," the Court of Appeals observed:

> It is also helpful when construing provisions of the Michigan no-fault insurance act to look to the Uniform Motor Vehicle Accident Reparations Act (UMVARA). The UMVARA is one of the model acts which was utilized as source material in the drafting of the no-fault act. *Citizens Ins Co of America v Tuttle*, 411 Mich 536; 309 NW2d 174 (1981). Thus, where a provision of the no-fault act is virtually identical to a provision of the UMVARA, the UMVARA will be looked to for guidance in construing a provision of the no-fault act. See *MacDonald v State Farm Mutual Ins Co*, 419 Mich 146; 350 NW2d 233 (1984). However, where there is an absence of a comparable provision in the Michigan act, it is presumed the Legislature considered but rejected the proposed language in the uniform act. See *Michigan Mutual Ins Co v Carson City Texaco, Inc*, 421 Mich 144; 365 NW2d 89 (1984). [*Id*. at 398-399.]

The *Spencer* Court then examined the language and official comments of the counterpart of § 3109a in the model act, 14 ULA Civil Procedural and Remedial Laws, UMVARA, § 14(b)(2). Notably, the Court of Appeals quoted the official comments to § 14(b)(2):

> "The cost reductions may be significant, however, in the case of an insurer offering to sell basic reparation policies to the employees

4

of a large employer, who have defined, generous wage-continuation and accident and health benefits under a common employer-furnished or trade union plan." [*Spencer, supra* at 399-400.]

In light of the differences between Michigan's no-fault act and the model act, the Court of Appeals reasoned:

> Thus, it is clear from the comments that, under the UMVARA, wage continuation benefits pursuant to a union agreement were intended to be coordinated with no-fault benefits otherwise payable. Instead of adopting the broader language of the uniform act, however, the Michigan act was drafted much more narrowly, and limited coordination to "other health and accident coverage." It appears, therefore, that in enacting the Michigan act the Legislature did not intend for no-fault benefits to be coordinated with a broad array of other benefits which may perhaps be equally duplicative. [*Id.* at 400.]

Thus, the Court of Appeals in *Spencer* held that the plaintiff's wage continuation benefits pursuant to a collective bargaining agreement did not constitute "other health and accident coverage" within the meaning of § 3109a.

### C. *Rettig v Hastings Mut Ins Co*

In *Rettig*, *supra*, the Court of Appeals was again called upon to interpret § 3109a. The plaintiff in *Rettig* was injured in an automobile accident. At the time of the accident, the plaintiff was insured by the defendant under a no-fault insurance policy that contained a coordinated-benefits provision. The plaintiff also had an LTD plan issued by a different insurance company and made available

5

to the plaintiff by her employer. The LTD plan was paid for by the plaintiff through payroll deductions. Notably, the plaintiff was employed as a supervisor and was not covered under a collective bargaining agreement. The trial court held that the defendant was entitled to a setoff under § 3109a because the plaintiff's LTD plan constituted "other health and accident coverage" under § 3109a, and the Court of Appeals affirmed.

The *Rettig* Court, similar to the *Spencer* Court, observed that "[w]hile the scope of coverage included within the meaning of 'other health and accident coverage' . . . has expanded since *LeBlanc*, it has generally been limited to benefits typically associated with health insurance plans." *Rettig*, *supra* at 333. Accordingly, the Court of Appeals concluded that the LTD benefits received by the plaintiff fell within the purview of § 3109a "because they constitute protection typically provided by health insurance plans, which include payments for medical expenses resulting from an accident as well as wage-loss replacement benefits." *Rettig, supra* at 333.

Importantly, the Court of Appeals reasoned that its holding did not conflict with *Spencer*. The panel in *Rettig* observed that the plaintiff in *Spencer* received wages directly from his employer pursuant to a collective bargaining agreement. The Court of Appeals further noted:

6

There, this Court observed that under the Uniform Motor Vehicle Accident Reparations Act, wage continuation benefits pursuant to a union agreement were intended to be coordinated with no-fault benefits, but that the Michigan version of the uniform act contained more restrictive language and limited coordination of benefits to insurance coverage. In contrast to *Spencer*, the long-term disability benefits in this case were provided to plaintiff by Reliance Standard Life Insurance Company pursuant to an insurance policy, not a collective bargaining agreement." [*Id.*]

### III. The Court of Appeals Decision in This Case

Here, the Court of Appeals, in an unpublished two-to-one decision, concluded that this case "is more like *Spencer* than *Rettig*." Unpublished opinion per curiam, issued January 27, 2004 (Docket No. 245068). The majority reasoned that, like the plaintiff in *Spencer*, this "plaintiff received wage loss benefits from his employer through a formal wage continuation plan pursuant to a collective bargaining agreement. Consistent with established precedent, we agree with the trial court and conclude that those wage continuation benefits are not 'other health and accident coverage' within the contemplation of MCL 500.3109a."

Judge Zahra dissented, concluding that defendant was entitled to a setoff for the LTD wage-loss benefits because this case was more like *Rettig* than like *Spencer*. Unlike the benefits in *Spencer*, Judge Zahra opined, the LTD benefits in this case were not paid directly by the

7

employer; rather, the plan was self-funded through accumulated payroll deductions. Accordingly, the Court of Appeals dissent found *Rettig* controlling because the LTD benefits plaintiff received constituted protection typically provided by health insurance plans. Moreover, Judge Zahra reasoned that the notion that plaintiff's LTD benefits were not actually provided by an insurance company was not dispositive.

## IV. DISCUSSION

I agree with the majority that the case law is sufficiently "muddled" regarding the precise meaning of "other health and accident coverage." Moreover, I agree with the majority that the great weight of the case law suggests that the key question for § 3109a purposes is whether the coverage is typically provided by an insurance company. I disagree, however, with the majority's decision to peremptorily overrule *Spencer*, *supra*. Moreover, I disagree with the majority's decision to decide this case without the benefit of full oral argument and briefing.

In light of *Spencer*'s thoughtful analysis, I do not believe that the legislative distinction noted by the Court of Appeals is accidental. Even if the term "coverage" is interpreted broadly, there is a difference between a self-funded, noninsurance LTD plan pursuant to a collective bargaining agreement and a so-called typical insurance plan

8

for purposes of the no-fault act. Moreover, I am persuaded by *Spencer*'s rationale that the Legislature intended this difference to be dispositive when it refused to incorporate the broader UMVARA provision into our no-fault act. Accordingly, if a person falls in the *Spencer* box, such as this plaintiff, then setoff is not permitted under § 3109a. However, if a person falls within the *Rettig* box, then setoff is permitted. As noted by the trial court, this dichotomy is not as arbitrary as it appears.[1] Thus, because I am not convinced that *Spencer* was wrongly decided, and because plaintiff falls within the *Spencer* box, I would affirm the Court of Appeals decision.

The majority concludes that *Spencer* was erroneously decided because "[i]t is simply not relevant under the

---

[1] In granting plaintiff's motion for summary disposition, the trial court stated:

> I am persuaded that at this time case law does clearly hold that the legislature intended section 3109a only to apply to wage continuation benefits which are funded by insurance as opposed to wage continuation benefits which are self-funded. That is not as arbitrary as it at first may sound, because I agree with the Defendant that there's a clear legislative policy behind the statute, and that to trade—or mandate, I should say, the trading of a class of lower premium insurance policies in return for the acceptance by the consumer of coordination of benefits, not in this fact situation we're not talking about a consumer buying an insurance policy. We're talking about a consumer being part of a bargaining unit which collectively bargained a self-funded, non-insurance funded wage continuation benefit.

9

statutory text whether the coverage arose from a collective bargaining agreement." *Ante* at p 15. Rather, "[t]he text of § 3109a refers to health and accident coverage–the central question is whether other coverage *exists*, not *how* it came to exist." *Id*. (emphasis in original). The majority then criticizes the *Spencer* Court for examining the language of the model act on which our no-fault act was based and for venturing beyond the text of the statute. Stated differently, the majority criticizes the *Spencer* Court for evaluating the "muddled" case law construing the text of the statute, for examining the model act on which our no-fault act was based, and for not ignoring the elephant standing in the corner once the panel reasonably concluded that there is a glaring difference between the two acts.

This Court, however, has previously acknowledged that it is entirely appropriate, if not prudent, to examine a model act on which a Michigan statutory scheme was based when attempting to discern the Legislature's intent. See, e.g., *Donajkowski v Alpena Power Co*, 460 Mich 243, 256 n 14; 596 NW2d 574 (1999) ("The fact that our Legislature did not include this restriction in adopting its version of the model contribution act is significant to any good-faith effort to give meaning to the Legislature's intent."). Here, the UMVARA "clearly was 'one of the model acts

10

utilized as source material in the drafting of the no-fault act . . . .'" *Marquis v Hartford Accident & Indemnity (After Remand)*, 444 Mich 638, 652 n 17; 513 NW2d 799 (1994), quoting *Tuttle*, *supra* at 546. And § 3109a was plainly based on § 14(b)(2) of the UMVARA. See *Spencer*, *supra*. Moreover, this Court has held that "where the statutory language differs from the UMVARA model, courts can presume that the Legislature considered the model act and rejected it." *Marquis*, *supra* at 652 n 17. Thus, in my view, the *Spencer* panel properly consulted the model act's language and official comments when making its decision. See, e.g., *Ouellette v Kenealy*, 424 Mich 83, 86-87; 378 NW2d 470 (1985).

Even though the majority claims that the UMVARA should not have been examined, the majority nonetheless travels beyond the text of the statute in an attempt to explain away the Legislature's deviation from the language in the model act and, at the same time, further undermine the *Spencer* Court's ultimate conclusion. For example, the majority posits that the Legislature may not have included the language from § 14(b)(2) of the model act because "our Legislature might simply have found a better way than the drafters of the model provision to express the same protection." *Ante* at 17. The majority further surmises, "[p]erhaps our Legislature used a synonym or more succinct

11

language to state whatever the drafters of the model provision had attempted to say." *Id*. Without citing any particular provision, the majority also hypothesizes that "the Legislature might have concluded that another statutory provision in Michigan rendered the model provision unnecessary." *Id*. The majority poses these questions in an effort to discount the *Spencer* Court's conclusion that § 3109a is more narrow than the model act.

In my view, however, the majority's attempts only solidify the conclusion reached in *Spencer*. Again, this Court has held that "where the statutory language differs from the UMVARA model, courts can presume that the Legislature considered the model act and rejected it." *Marquis*, *supra* at 652 n 17. Accordingly, *Spencer*'s position that the Legislature rejected the applicable portion of the UMVARA in favor of a more narrow provision is more defensible than the majority's translucent attempts to explain away the deviation and further muddy the waters. I believe that the *Spencer* Court adequately explained that because the Legislature rejected one portion of § 14 of the UMVARA, the Michigan statute is "narrower" (i.e., it does not contain the rejected portion of § 14). Moreover, I believe that under these circumstances—where § 14 of the UMVARA differs from § 3109a, and a self-funded noninsurance LTD plan under a collective bargaining agreement is

12

implicated—the Michigan statute produces a different result.

Further, the majority explains that "even if a statute *is* written more narrowly than a model provision, a court's analysis does not end there" because even the narrow statute could apply to the facts of a given case. *Ante* at 18 (emphasis in original). Thus, even if *Spencer* were supportable, the majority claims that a court cannot merely assert that the statute is narrow and conclude that it does not apply. The majority simply dismisses the *Spencer* Court's analysis as incomplete.

In my view, *Spencer*'s rationale is plainly supportable. The primary goal of statutory interpretation is to discern the Legislature's intent. To this end, the Court of Appeals examined the relevant statutory language and the "muddled" case law that construed this language, consulted the source of the statutory provision, found a difference between the model act and the statutory provision, and reasonably concluded that the Legislature rejected this portion of the model act and intended that wage continuation benefits pursuant to a collective bargaining agreement should not constitute "other health and accident coverage" within the meaning of § 3109a. I do not believe that *Spencer*'s approach was incomplete. Indeed, I believe the approach was prudent and supported by

13

our case law.  When compared with the majority's approach, I prefer *Spencer*'s approach under these circumstances because it best effectuates, rather than ignores, the Legislature's apparent intent.

Finally, I would be remiss if I did not point out that neither the parties nor the lower courts in this case questioned the validity of *Spencer*'s rationale.  Rather, defendant and the Court of Appeals dissent simply argued that this case was more like *Rettig* than *Spencer*.  Because the majority has seen fit to take aim at *Spencer*, the parties never specifically briefed this issue, and, arguably, this result was not clearly foreshadowed, I would have preferred to grant leave to appeal to have the benefit of full briefing and oral argument on *this particular issue*.  As shown by the majority and dissenting opinions, the ongoing validity of *Spencer* is a jurisprudentially significant issue that could have wide implications.  Thus, even though I believe at this point that *Spencer* was properly decided, I would prefer to grant leave and actually hear what the parties have to say on this particular issue.

V. CONCLUSION

I would conclude that *Spencer* was correctly decided and, therefore, would hold that the LTD plan covering this plaintiff is not subject to setoff under § 3109a.

14

Accordingly, I would affirm the decision of the Court of Appeals. However, because *Spencer*'s viability is jurisprudentially significant and the parties did not specifically brief this issue, I would prefer to grant leave to appeal to have the benefit of full briefing and oral argument on whether *Spencer* was properly decided. Thus, I must respectfully dissent.

Michael F. Cavanagh
Marilyn Kelly